IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Chemoil Latin America Inc. | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO.  4:17-cv-00813 |
| v. | § | |
| | § | |
| Cinque Terre Financial Group Ltd. and its | § | IN ADMIRALTY, Rule 9(h) |
| alter egos Elemento, Ltd. (formerly CT | § | |
| Energia Ltd.),  Cinque Terre Peru S.A.C., | § | |
| Ruben Alejandro Goldstein (a/k/a Alex | § | |
| Goldstein), Alessandro Bazzoni, and Richard | § | |
| Rothenberg (holder of United States  Passport | § | |
| No.: 473468141) (collectively | § | |
| "CTFG/ELEMENTO/Elemento") | § | |
| | § | |
| Defendants, and | § | |
| | § | |
| SK Energy Americas, Inc. | § | |
| | § | |
| Garnishee. | § | |

**FIRST AMENDED VERIFIED COMPLAINT WITH REQUEST FOR ISSUANCE OF
PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT
AND REQUEST FOR A WRIT OF ORIGINAL ATTACHMENT**

Chemoil Latin America Inc. ("Chemoil") hereby, pursuant to Fed. R. Civ. P. 15(a)(1)

amends its complaint, bringing this action against defendant Cinque Terre Financial Group Ltd.

including its alter egos Elemento, Ltd. (formerly CT Energia Ltd.),  Cinque Terre Peru S.A.C.,

Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni, and Richard Rothenberg

(holder of United States  Passport No.: 473468141) (collectively herein "CTFG/ELEMENTO")

all *quasi in rem* pursuant to Supplemental Rule B for Certain Admiralty and Maritime Claims,

Fed. R. Civ. P. 64, and  Tex. Civ. Prac. & Rem. Code § 61.001 et seq. and for a cause of action

states as follows:



## Jurisdiction and Venue

1.      This is an action within this Court's admiralty jurisdiction pursuant to 28 U.S.C. §
1333 and is an admiralty or maritime claim within Supplemental Rule B and Fed. R. Civ. P. 9(h),
in that it involves the breach of a maritime contract, or in the alternative, a maritime tort, namely,
the taking of maritime property by fraud.  This action further is within this Court's diversity
jurisdiction pursuant to 28 U.S.C. § 1332 in that defendant Richard Rothenberg is a citizen of the
United States with a residence in Florida, Chemoil is a Panama corporation, and the amount in
controversy exceeds $75,000 exclusive of interest and costs, and further proceeds against all
remaining defendants under the supplemental jurisdiction of this Court pursuant to 28 U.S.C.  §
1367.   This action further is within this Court's federal question jurisdiction pursuant to 28
U.S.C.  § 1331 in that defendants as detailed herein have violated the  Racketeer Influenced
Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*  Finally, this case further is within this
Court's original jurisdiction pursuant to 28 U.S.C.  § § 1334 ("Bankruptcy cases and
proceedings") in that it is a proceeding related to the case proceeding before the United States
Bankruptcy Court, Southern District of New York, addressed in further detail below,  under
Chapter 15 of Title 11, concerning defendant Cinque Terre Financial Group Ltd.

2.      Venue is proper in this Court because the Garnishee is located and can be found
in this District and because property in which CTFG/ELEMENTO has an interest, namely,
accounts payable from the Garnishee, is under the control of the Garnishee and therefore is or
soon will be in this District.  CTFG/ELEMENTO including its alter egos cannot be found in this
District within the meaning of Supplemental Rule B.

## The Parties

3.      Chemoil is a Panama corporation with its offices in Panama City, Panama which
buys and sells fuel for the provision to and operation of ocean-going vessels.

2

Case 1:17-cv-00453    Document 12    Filed 01/19/17    Page 3 of 37

4.      CTFG/ELEMENTO as described in greater detail herein is a conglomeration of purported British Virgin Islands, Maltese and Peruvian companies owned and/or controlled by the same individuals, their alter egos, Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni and Richard Rothenberg.   Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni and Richard Rothenberg have used the name of CTFG/ELEMENTO to purchase and resell, as detailed herein, certain cargoes of naptha, including from Petroperu and to Garnishee, and to take for themselves at least **US$3,948,502.41** from Chemoil as detailed herein.

5.      Chemoil also alleges that Cinque Terre Financial Group, Ltd. and Alessandro Bazzoni are one and the same.  Alessandro Bazzoni branded all of his companies with the "Cinque Terre" or "CT" moniker, which is an abbreviation for "Cinque Terre." Alessandro Bazzoni has claimed that the "Cinque Terre" name refers to his family's roots and ownership interests in property in the Cinque Terre region of Italy – a cluster of five villages on the Italian Riviera.  CTFG/ELEMENTO throughout the time pertinent to this Complaint, have interchangeably used the names "Cinque Terre," "CT" and "CT Energia" to refer to their collective operations, which have continued into the operations of their alter-ego, defendant Elemento, Ltd.

6.      Chemoil alleges that Alessandro Bazzoni has abused corporate form such that he should be personally liable for the debts of Cinque Terre Financial Group, Ltd.  On information and belief, Chemoil alleges that Bazzoni used Cinque Terre Financial Group, Ltd.'s and successors' accounts to purchase personal property, including a vacation home in Palm Beach, Florida and renovations to a friend's home in Bridgehampton, New York; to pay for personal expenses, including among other things, medical expenses, automobiles, luxury travel for himself and his friends, and expenses associated with horses and fees for participating in polo

Case 1:17-cv-00453   Document 1-2   Filed 01/19/17   Page 2 of 12

tournaments all over the world.  Alessandro Bazzoni has used a web of companies that he controls to orchestrate a complex fraud against Chemoil and others to avoid repayment of funds owed to Chemoil and others.

7.      Richard Rothenberg was Chief Financial Officer of Cinque Terre Financial Group, Ltd., a de facto director of  Cinque Terre Financial Group, Ltd., and appears to have been involved in a number of the Company's transactions, as well as a key member of the management team.  He also as detailed below has continued to be involved as a Director of the alter egos of Cinque Terre Financial Group, Ltd.  Richard Rothenberg is the holder of United States  Passport No.: 473468141, a United States citizen and a resident of the state of Florida.

8.      Ruben Alejandro Goldstein was Chief Operating Officer of Cinque Terre Financial Group, Ltd. and was listed as the Director of Marketing for another entity within the group of companies connected to Cinque Terre Financial Group, Ltd.,  CT Energia Holding Limited, and as detailed below holds interest in other affiliated companies, including in Peru.

9.      Cinque Terre Financial Group Ltd. was a company incorporated in the British Virgin Islands ("BVI") on March 12, 2008.  Defendant Alessandro Bazzoni has always been the sole director and member of Cinque Terre Financial Group Ltd. until Cinque Terre Financial Group Ltd. was on April 11, 2016 placed into involuntary liquidation proceedings in BVI. Defendant Richard Rothenberg was the Chief Financial Officer , and Ruben Alejandro Goldstein (a/k/a Alex Goldstein) the Chief Operating Officer of Cinque Terre Financial Group Ltd. Following the initiation of the BVI proceedings, on April 27, 2016, the BVI Liquidator filed in the United States Bankruptcy Court for the Southern District of New York, a a Chapter 15 petition for recognition of the BVI liquidation, Case No. 16-11086 (JLG).

10.      The U.S. Bankruptcy Court recognized the BVI liquidation proceding  on June 21, 2016 (recognition order, **Exhibit A hereto**).  Chemoil proceeds here with the permission of

Case 8:17-cv-00453-JD   Document 12   Filed 01/09/18   Page 5 of 19

the liquidator ("Foreign Representative" in Chapter 15) to secure payment of the amounts owed
to Chemoil by CTFG/ELEMENTO which are also property of the BVI liquidation estate.

11.    CTFG/ELEMENTO has been engaged in a range of fraudulent activities, as
detailed herein.  Ernst & Young Switzerland only audited the financial statements of Cinque
Terre Financial Group Ltd. for the period ending 31 December 2008, with the corresponding
audit report being issued on 26 June 2009.  Cinque Terre Financial Group Ltd. , however, caused
counterfeit audit reports ( issued over the name of Ernst & Young) to be issued for  2010 and
2011.  Ernst & Young in 2012 confirmed to defendant Richard Rothenberg that these reports
were counterfeit.  Defendant Alessandro Bazzoni utilized the counterfeit audit reports, including
ones dated in 2013 and 2014, to misrepresent the financial position of Cinque Terre Financial
Group Ltd.

12.    After the commencement of the BVI liquidation, defendants Alessandro Bazzoni,
Richard Rothenberg and Ruben Alejandro Goldstein continued the operations of Cinque Terre
Financial Group, Ltd., by information and belief, using resources of Cinque Terre Financial
Group, Ltd., through other foreign corporate entities which they controlled, including but not
limited to defendant CT Energia Ltd.  (later renamed "Elemento, Ltd.")  formed in another
jurisdiction, Malta.   By information and belief, defendants Alessandro Bazzoni, Richard
Rothenberg and Ruben Alejandro Goldstein created this new CT Energia Ltd.  (later renamed
"Elemento, Ltd.")  along with two other "Cinque Terre" entities, CT Energia Holding Ltd. and
CT Energia Oil and Gas Ltd, all in Malta. Collectively these businesses held themselves out as
"CT Energia" for the purpose of using their new Maltese corporate form to avoid paying the
Cinque Terre Financial Group, Ltd. debt to Chemoil. To further frustrate Chemoil's and others'
efforts to collect debt, by information and belief, defendants Alessandro Bazzoni, Richard

5

Case 1:17-cv-00453-1    Document 1/29    Filed 07/29/17 13:25 Page 6 of 4c70

Rothenberg and Ruben Alejandro Goldstein stripped the Maltese companies of their apparent
"CT Energia" connection, and renamed them "Elemento."

13.    Defendant CT Energia Ltd. d/b/a Elemento Ltd. is a Maltese company, wholly
owned by defendant CT Energia Holding, Ltd., which in turn is owned and controlled by
defendant Bazzoni.  In or about July 25, 2016, by information and belief, defendants Alessandro
Bazzoni, Richard Rothenberg and Ruben Alejandro Goldstein  caused a filing in Malta to change
the name of Defendant CT Energia Ltd. to "Elemento Ltd."

14.    Documents in the Malta corporate registry confirm that on December 9,
December 2015, "CT Energia Holding Ltd" (another Maltese company) purported to transfer
1165 Ordinary shares in the company to "CT Energia Oil and Gas Ltd."   At this time,
defendants Alessandro Bazzoni  and Richard Rothenberg were directors of CT Energia Ltd.   On
January 13, 2016,  Richard Rothenberg resigned as director; Francisco D'Agostino was
appointed as a director.  Then, on June 21, 2016, the company name was changed from CT
Energia Ltd to Elemento Ltd.  Finally on August 18, 2016 – Alessandro Bazzoni and Francisco
D'Agostino resigned as directors and Richard Rothenberg was reappointed as a director (along
with Carlos Galindez Arias).

15.    Defendant CT Energia Ltd. d/b/a Elemento Ltd. is sued in its capacity as an alter
ego of, and as controlled and/or operated by defendants Alessandro Bazzoni, Richard
Rothenberg and Ruben Alejandro Goldstein, and as such, is liable to Chemoil to the same extent
as the other defendants.

16.    Documents in the Malta corporate registry confirm that on February 4, 2016,
Alessandro Bazzoni, sole owner of CT Energia Oil & Gas Ltd,  transferred 1000 Ordinary shares
of the company to Francisco D'Agostino.  Then, on June 22, 2016, the company changed its
name from CT Energia Oil & Gas Ltd To Elemento Oil & Gas Ltd .  On August 19, 2016,

Alessandro Bazzoni and Francisco D'Agostino resigned as directors, and Richard Rothenberg

was appointed as director (also along with Carlos Galindez Arias).

17.     Cinque Terre Peru S.A.C. is a Peruvian company founded in 2012. It has one

employee, its General Manager Jesus J. F. Pereyra. Defendants Alessandro Bazzoni and Ruben

A. Goldstein are the owners of Cinque Terre Peru S.A.C.

18.     Garnishee SK Energy Americas ("Garnishee") is an entity with an office located

in this District which holds accounts which are the property of and/or owing to

CTFG/ELEMENTO (including its alter egos).

### Facts

19.     Chemoil entered into a contract dated 15 August 2014 as sellers with

Cinque Terre Financial Group, Ltd. as buyers for the sale and purchase of 40,000 barrels +/-10%

in Buyer's option of Marine Gas Oil (MGO) for delivery on FOB ("free on board") Incoterms via

pump out from Decal Taboguilla via two separate barge loadings Panama between 19-28 August

2014 (the "Contract"). MGO is a fuel specially and uniquely formulated for maritime use,

aboard ocean-going and inland waterways vessels. Chemoil's MGO was for carriage aboard and

then use aboard ships and therefore the contract for its sale was and is a maritime contract.

20.     On or about August 19, 2014, Al Alpha, apparently employed by Cinque Terre

Financial Group, Ltd. , confirmed the contract and arrangements for the vessel the contract

required (M/T CENTENARIO TRADER (IMO No. 7367275) , using the email

alpha@ctenergia.com . The company named "CT Energia," as set out above, is one which

defendants caused to be renamed, later, Elemento, Ltd. Al Alpha now is employed, by

information and belief, by Elemento, Ltd.

21.     The Chemoil contract (Confirmation, **Exhibit B hereto**) expressly was subject to

English law and was and is an agreement relating to the carriage of goods in a ship or to the use

Case 1:17-cv-00453    Document 1-2    Filed 11/27/17    Page 9 of 37

or hire of a ship, providing including the following:

> I) BUYERS SHALL PROCURE THAT **THE VESSEL SHALL** COMPLY WITH THE
> REQUIREMENTS OF THE INTERNATIONAL CODE FOR THE SECURITY OF
> SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO
> CHAPTER XI OF SOLAS (ISPS CODE) AND WHERE THE LOADING PORT IS
> WITHIN THE USA AND US TERRITORIES OR WATERS, WITH THE US
> MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA),

> II) **THE VESSEL SHALL** WHEN REQUIRED SUBMIT A DECLARATION OF
> SECURITY (DOS) TO THE APPROPRIATE AUTHORITIES PRIOR TO ARRIVAL
> AT THE LOADING PORT.

> III) NOTWITHSTANDING ANY PRIOR **ACCEPTANCE OF VESSEL** BY SELLER,
> IF AT ANY TIME PRIOR TO THE PASSING OF RISK AND TITLE THE VESSEL
> CEASES TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR
> MTSA:

> VESSEL AND ANY DEMURRAGE RESULTING SHALL NOT BE FOR THE
> ACCOUNT OF THE SELLER.

> B) BUYER SHALL BE OBLIGED TO SUBSTITUTE SUCH **NOMINATED VESSEL**
> WITH A VESSEL COMPLYING WITH THE REQUIREMENTS OF THE ISPS CODE
> AND MTSA.

(Emphasis added).

22.    CTFG/ELEMENTO chartered or hired the ship M/T CENTENARIO TRADER

(IMO No. 7367275) and Chemoil accepted the ship M/T CENTENARIO TRADER, pursuant to

the parties' maritime contract, for receipt of and carriage of the Chemoil Marine Gas Oil (MGO).

The MGO was maritime property, namely, fuel specifically formulated for use on ships.  The

M/T CENTENARIO TRADER received the MGO at Decal, Panama, and then sailed with the

MGO to Taboguilla Island, Panama.  The M/T CENTENARIO TRADER sailed to Taboguilla

Island, Panama with two separate ocean shipments, 40,548.401 barrels of MGO by way of a first

delivery of 22,611.891 barrels on 21 August 2014 and a second delivery of 17,936.510 barrels on

24 August 2014.

23.    The M/T CENTENARIO TRADER  was then and still is owned by Bunker

Case 1:17-cv-00453-1 Document 129 Filed ... Page Exhibit A

Vessel Management, S.A., Panama. That company's website (http://tradertanker.com) listing the vessel, explains "We are a corporation dedicated to the transport and supply of **marine fuels** inside and outside the Republic of Panama." (emphasis added).

24.    For each of the two shipments, Chemoil issued a distinct Marine Fuel Delivery Receipt (**Exhibits C and D hereto**). Each Marine Fuel Delivery Receipt stated the name of the Vessel, M/T CENTENARIO TRADER. The Master or Chief Engineer signed each Marine Fuel Delivery Receipt, confirming as follows:

> The marine fuel described herein in delivered in accordance with Chemoil Standard Terms and Conditions of Sale (a copy of which has been provided to buyer prior to delivery) and on credit of the vessel. Any disclaimers as to the creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ship's officer signing this Receipt to bind the vessel and her owner to the above are null and void, unless an authorized representative of Chemoil shall have otherwise agreed in writing at the time Buyer initially orders the marine fuel. Failing such agreement, delivery shall, under no circumstances, constitute a waiver by Chemoil of the above.

*  *  *

DECLARATION OF MASTER/CHIEF ENGINEER

> I declare that the information given above is true and correet to the best of my knowledge and belief; that I have knowledge of the facts set forth herein; that the articles described in the notice of lading were received in the quantities were laden on the vessel named above for use on said vessel as supplies, except as noted below.

> Received for use as bunkers, together with representative sample, the quantities shown above. Exact quantities shown are subject to correction in case of error:

25.    Chemoil issued  its invoices in respect of each of the deliveries on 17 September 2014 (albeit dated 31 August 2014). These invoices totalled US$4,948,502.41.

26.    CTFG/ELEMENTO made only one payment to Chemoil of US$1,000,000 against the outstanding amount, leaving a balance of US$3,948,502.41 due and owing (not including interest).

27.    On October 8, 2014, Richard Rothenberg  (using the email address

(rr@ctenergia.com – again, the "CT Energia" company later renamed "Elemento, Ltd.") wrote

Chemoil as follows:

> We are aware of the outstanding invoice we have to you. We had asked for the
> invoice to be sent, but it never came. We understand that there was an switchover
> in your financing department that caused the delay of the invoice. However, our
> LC and financing has expired, and we need to arrange new financing which we
> are doing currently. I will revert with the expected timing on that, but we expect it
> will be finalized by the middle of next week.
>
> Thanks,
> Richard Rothenberg
> Chief Financial Officer
> CT Energia, Ltd.

28.     Thereafter through the use of the wires, namely, email and telephone,

CTFG/ELEMENTO repeatedly misrepresented to Chemoil that they would pay Chemoil, as

follows:

(a)     In November 2014,  CTFG/ELEMENTO proposed assigning proceeds and

selling crude oil to Chemoil, but never followed through with the proposals;

(b)     In December 2014,  CTFG/ELEMENTO advised that they would make a

$1,000,000 payment to Chemoil by year end, but never made that payment;

(c)     In February, 2015, CTFG/ELEMENTO advised that it would make a

$1,000,000 payment to Chemoil on February 17th-18th, failed again to make

payment and then offered a payment plan, however, never provided that plan;

(d)     In April, 2015, CTFG/ELEMENTO made a further payment plan

proposal, but again Chemoil received no payment.

(e)     In May, 2015, CTFG/ELEMENTO misrepresented that it was engaging in

a financial restructuring and promised a payment of $100,000, which again was

never made.

29.     After many months of correspondence with CTFG/ELEMENTO in which a

10

Case 1:17-cv-00852-1   Document 129-1   Filed 00/09/03 1:27   Page 11 of 9

payment plan was discussed, it became evident that CTFG/ELEMENTO did not intend to honor

any of its promises and in fact had misrepresented its intent to do so, on which Chemoil had

relied in good faith.

30.    On or about February 10, 2017, however, CTFG/ELEMENTO purchased 220,000

bbls of naptha from Petroperu, the state oil company of Peru, at a price that is US$2/bbl above

the market  price.  A copy of the Petroperu confirmation of this purchase is **Exhibit E hereto**,

naming Alex Goldstein as the contact for "Cinque Terre Financial Group, Ltd."

31.    In negotiating the transaction with Petroperu, CTFG/ELEMENTO and by

information and belief, defendant Alex Goldstein and/or Jesus Pereyra Arizola, General Manager

of Cinque Terre-Peru, represented that defendant Alessandro Bazzoni was then the Chief

Executive Officer of  Cinque Terre Financial Group, Ltd.  At this time, however, Cinque Terre

Financial Group, Ltd. was (and continues to be) in the BVI liquidation proceedings.

CTFG/ELEMENTO and by information and belief, defendant Alex Goldstein and/or Jesus

Pereyra Arizola, General Manager of Cinque Terre-Peru, requested that the bill of lading for the

transaction be issued in the name of Elemento, Ltd., which they represented to Petroperu to be

the financial arm of Cinque Terre Financial Group, Ltd.   Jesus Pereyra Arizola, General

Manager of Cinque Terre-Peru wrote Petroperu on or about February 10, 2017 as follows:

> 1.- On Friday, the CEO of Cinque Terre, Mr. Alessandro Bazzoni, will send the formal acceptance of the last tender of Virgin Naphta won by Cinque Terre, to your direction. Please confirm your receipt of the same. Thank you.
>
> 2.- Also, for any formal communication between both parties, the new fax number of the company is the following: +44 207 691 7889.
>
> 3.- And lastly and to communicate by instructions of the CEO Sr. Alessandro Bazzoni that the foreign counterpart, outside myself and Mr. Joaquin Garcia, who will be in charge of coordinating and necessary details of the operations of the Virgin Naphta with you or any persons within PetroPeru, in this case will be Mrs. Dolly Mendoza (Direct Phone: 00-58-416-8250694). She will also have your cell number to communicate directly with you. I await your further comments.

Best regards,
Atte

Jesus Pereyra Arizola
Cinque Terre
Representante en Lima Peru
Cel (51) 947-169893

32.    CTFG/ELEMENTO by information and belief paid Petroperu for the cargo,

sending Petroperu original documentary instructions for the cargo bill of lading to be made out to

Cinque Terre Financial Group, Ltd.    Later, CTFG/ELEMENTO requested Petroperu to issue

the bill of lading to Elemento, Ltd., however, Petroperu refused.    This was because the sale of

the naphtha cargo could only be made by Petroperu to a holder of a license to purchase from

Petroperu, namely, Cinque Terre Financial Group, Ltd.    Both Alessandro Bazzoni and Joaquin

Garcia corresponded with Petroperu as being affiliated with "CTE Ltd."

33.    The naptha cargo purchased by CTFG/ELEMENTO is or very soon will be

loaded aboard a vessel in Peru, chartered by Garnishee.  By information and belief, the cargo is

being carried under a bill of lading issued to Cinque Terre Financial Group, Ltd., the license

holder for purchase from Petroperu and receipient of the February 17, 2017 Petroperu award for

that purchase.  Chemoil believes that, according to standard commercial transactions of this type,

Garnishee will upon loading of the naptha cargo transfer to CTFG/ELEMENTO payment for the

cargo.

34.    Chemoil now understands from the Garnishee, that the Garnishee is withholding

payment for the cargo, subject to the writ issued in this action and served on the Garnishee, and

further order of this Court.

## Count I – Breach of Maritime Contract

35.    Chemoil incorporates the above paragraphs as if fully set forth herein.

36.     CTFG/ELEMENTO including through its alter egos has breached its maritime contract with Chemoil as set out above.  Despite repeated demand, Chemoil remains unpaid.

37.     Chemoil therefore demands judgment, as set out more fully below.

### Count II: Maritime Attachment and Garnishment (Rule B)

38.     Chemoil incorporates the above paragraphs as if fully set forth herein.

39.     This Court should order the issue of a writ of maritime attachment and garnishment to Garnishee(s) to attach the property ( including accounts payable) held or owed by Garnishee for or to CTFG/ELEMENTO including its alter egos.

40.     CTFG/ELEMENTO cannot be found within this District within the meaning of Rule B, and has pendency of this action, property and/or assets in this jurisdiction consisting of cash, funds, freight, hire, and/or credits in the hands of Garnishee, a garnishee in this District.

### Count III: Prejudgment Attachment
### (Tex. Civ. Prac. & Rem. Code § 61.001 et seq.)

41.     Chemoil incorporates the above paragraphs as if fully set forth herein.

42.     CTFG/ELEMENTO is justly indebted to Chemoil because it failed to pay US$3,948,502.41 for MGO provided by Chemoil as required by the parties' contract dated 15 August 2014.

43.     Chemoil does not seek attachment for the purpose of injuring or harassing CTFG/ELEMENTO. Chemoil merely seeks to recoup the losses incurred by CTFG/ELEMENTO's breach of contract.

44.     Chemoil will probably lose its debt unless the writ of attachment is issued because it has become evident that CTFG/ELEMENTO does not intend to honor its promise to pay Chemoil for the MGO it provided.

13

Case 4:17-cv-00845-A   Document 129-1   Filed 07/29/17   Page 14 of 19

45.     Cinque Terre Financial Group Ltd.  and Elemento, Ltd. are foreign corporations and Ruben Alejandro Goldstein, Alessandro Bazzoni and Richard Rothenberg are not residents of the State of Texas.

46.     This Court should order the issue of a writ of original attachment and garnishment to Garnishee(s) to attach the property (including accounts payable) held or owed by Garnishee for or to CTFG/ELEMENTO including its alter egos.  In support of its request, Chemoil attaches an affidavit hereto setting forth the grounds for its issuance and the amount of its demand.

### Count IV: Fraud – Maritime Tort

47.     Chemoil incorporates the above paragraphs as if fully set forth herein.

48.     CTFG/ELEMENTO defrauded Chemoil by misrepresenting to Chemoil that CTFG/ELEMENTO had the ability to pay for the Marine Gas Oil which CTFG/ELEMENTO took from Chemoil.

49.     CTFG/ELEMENTO knew that its misrepresentations of solvency and intention to pay were false when it made them, and it made the misrepresentations with the intention that Chemoil rely on them.

50.     Chemoil reasonably relied on the misrepresentations of CTFG/ELEMENTO, which it would not have done had CTFG/ELEMENTO disclosed the truth of its situation including intention to pay for Chemoil's Marine Gas Oil.

51.     Chemoil was damaged as the result of its reasonable reliance on the CTFG/ELEMENTO misrepresentations.  Chemoil's Marine Gas Oil was maritime property and its taking by fraud constitutes a maritime tort.

52.     Chemoil therefore demands judgment, as set out more fully below.

### Count V: Civil RICO

53.     Chemoil incorporates the above paragraphs as if fully set forth herein.

Case 2:17-cv-00845-1  Document 7/29-1  Filed 09/29/17 13:25:55  Page 15 of 19

54.     Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni, and
Richard Rothenberg  violated 18 U.S.C. §1962 (c) by being associated with an enterprise which
affects interstate or foreign commerce to conduct or to participate, directly or indirectly, in the
conduct of such enterprises affairs through a pattern of racketeering activity.

55.     Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni, and
Richard Rothenberg  violated 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

56.     A RICO Act claim under 18 U.S.C. §§ 1962(c) and (d) requires a plaintiff to
prove: (1) a person engaged in (2) a pattern of racketeering activity connected to (3) the conduct
or control of an enterprise.

57.     Person: Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni,
and Richard Rothenberg  all qualify as "persons" under 18 U.S.C. § 1961(3). Each Defendant in
this suit is an "individual or entity capable of holding a legal or beneficial interest in property"
and, as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

58.     Racketeering Activity: A "racketeering activity" as defined by 18 U.S.C. §
1961(1) includes, inter alia, wire fraud.   Ruben Alejandro Goldstein (a/k/a Alex Goldstein),
Alessandro Bazzoni, and Richard Rothenberg  committed the "racketeering activity" of wire
fraud and the crime is punishable with imprisonment for more than one year.

59.     The Defendants are engaged in interstate and foreign acts of commerce and the
acts alleged herein have an effect on commerce.

60.     18 U.S.C. § 1343 (Wire Fraud): Ruben Alejandro Goldstein (a/k/a Alex
Goldstein), Alessandro Bazzoni, and Richard Rothenberg devised a scheme or artifice to defraud
by means of wire communication in interstate and foreign commerce.

61.     Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni, and
Richard Rothenberg  participated in an association in fact. They participated in an ongoing

organization and each associate functioned as a continuing unit. The individuals and the entities run by the individuals associated together to commit several criminal acts as set forth herein which gave their association an ongoing nature allowing it to come within the purview of the RICO Act. Thus, their association in fact constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

62.    In the alternative, the alleged corporate entities included in CTFG/ELEMENTO are legal entities constitututing an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni, and Richard Rothenberg are "persons," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the alleged corporate entities included in CTFG/ELEMENTO through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts wire fraud described supra.

63.    As a direct and proximate result of the Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) Chemoil has suffered injury to business, property and livelihood.

64.    The injuries suffered by Chemoil were reasonably foreseeable or anticipated by Ruben Alejandro Goldstein (a/k/a Alex Goldstein), Alessandro Bazzoni, and Richard Rothenberg as the natural consequence of their acts.

65.    Chemoil seeks treble damages, 18 U.S.C. § 1964(c).

### Prayer for Relief

WHEREFORE, Chemoil prays:

A.    That in response to Counts I and IV, this Court enter judgment against CTFG/ELEMENTO and in favor of Chemoil in the amount of at least **US$3,948,502.41** plus an

Case 1:17-cv-00815-1    Document 1/29/17    in exed 07/29/17 31:2   Page 17 of 19

additional 50% as provided in Supplemental Admiralty and Maritime Rule E, to allow for

accrued interest, fees and costs;

B.      That in response to Count II, since CTFG/ELEMENTO cannot be found within

this District pursuant to Supplemental Rule B, this Court maintain the Process of Maritime

Attachment and Garnishment pursuant to Rule B and served on Garnishee, attaching all of

CTFG/ELEMENTO's tangible or intangible property or any other funds held by such garnishee,

up to the amount of at least the amount demanded herein to secure Chemoil's claims, and that

this Court require Garnishee to appear and, pursuant to Supplemental Rule B, answer the matters

alleged in the Verified Complaint;

C.      That as provided in Supplemental Rule B, that such person over 18 years of age

be appointed as moved for herein pursuant to Supplemental Rule B and Fed.R.Civ.P. 4(c) to

serve any supplemental process of Maritime Attachment and Garnishment in this action; and

that this Court award Chemoil such other and further relief that this Court deems just and proper.

D.      That in response to Count III, this Court issue a writ of original attachment

returnable to this Court, attaching all of CTFG/ELEMENTO's tangible or intangible property or

any other funds held by such garnishee, up to the amount of at least the amount demanded herein

to secure Chemoil's claims.

E.      That in response to Count V, this Court enter judgment against

CTFG/ELEMENTO and in favor of Chemoil in the amount of at least **US$3,948,502.41**, that

amount trebled pursuant to 18 U.S.C. § 1964(c).

F.      That in response to each Count and claim herein, that this Court enter judgment

Case 4:17-cv-00815-1  Document 229-1  Filed in TXSD on 04/03/18  Page 19 of 19

for Chemoil for all just and proper relief, including interest, costs and attorneys fees.

Dated:  April 3, 2017.

/s/ *J. Stephen Simms*
J. Stephen Simms (*pro hac vice*)
Simms Showers LLP
201 International Circle, Suite 250
Baltimore, Maryland 21030
Telephone:    410-783-5795
Facsimile:    410-510-1789
jssimms@simmsshowers.com

Attorneys for Chemoil Latin America Inc.

**VERIFICATION**

I am a Principal of the law firm Simms Showers LLP, counsel to Plaintiff.

The facts alleged in the foregoing First Amended Verified Complaint are true and correct
to the best of my knowledge and information based upon the records of Plaintiff made available
to me by Plaintiff.  Authorized officers of Plaintiff are not readily available in this District to
make verifications on Plaintiff's behalf.  I am authorized to make this verification on Plaintiff's
behalf.  I further certify that, pursuant to Supplemental Rule B, I caused a search to be made of
electronic records and Directory Assistance for addresses and telephone numbers in the Southern
District of Texas.  There is no record of any general or resident agent authorized to accept
service of process for any Defendant in this District.

Defendants are justly indebted to Chemoil because they failed to pay US$3,948,502.41
for MGO provided by Chemoil as required by the parties contract dated 15 August 2014.
Chemoil does not seek attachment for the purpose of injuring or harassing Defendants. Chemoil
merely seeks to recoup the losses incurred by Defendants' breach of contract.

Chemoil will probably lose its debt unless the writ of attachment is issued because it has

Case 4:17-cv-00815-1   Document 129-1   Filed in TXSD on 04/03/17   Page 19 of 19

become evident that Defendants do not intend to honor their promise to pay Chemoil for the

MGO they provided.   Cinque Terre Financial Group Ltd. and Elemento, Ltd. are foreign

corporations and Ruben Alejandro Goldstein, Alessandro Bazzoni and Richard Rothenberg are

not residents of the State of Texas.

> Pursuant to 28 U.S.C. § 1746(1), I solemnly
> declare under penalty of perjury that the
> foregoing is true and correct.
>
> Executed on April 3, 2017.
>
> /s/ *J. Stephen Simms*
> J. Stephen Simms

Petróleos del Perú - PETROPERÚ S.A.                    



SSVI-0445-2017
FEBRUARY 10TH, 2017

CINQUE TERRE FINANCIAL GROUP LTD.
ATTN.: ALEX GOLDSTEIN

REF:    PETROPERU TENDER INVITATION SSVI-0364-2017/TENDER-009-2017 DATED FEBRUARY 06TH, 2017; AND
YOUR OFFER DATED FEBRUARY 09TH, 2017.

WE ARE PLEASED TO INFORM CINQUE TERRE FINANCIAL GROUP LTD. THAT PETROPERU HAS AWARDED
CINQUE TERRE FINANCIAL GROUP LTD. THE FOLLOWING FOB SALE:

1.    **PRODUCT AND QUANTITY:** ONE CARGO OF 220,000 BBLS +/- 10% (AT PETROPERU'S OPTION) OF VIRGIN
NAPHTHA TO BE DELIVERED FOB TALARA (INCOTERMS 2000).

2.    **BUYER:** CINQUE TERRE FINANCIAL GROUP LTD.

3.    **LOADPORT & LAYCAN:** TALARA, PERU DURING MARCH 08TH/12TH, 2017. A THREE DAY LAYCAN WILL BE
NARROWED BY CINQUE TERRE FINANCIAL GROUP LTD. BY MARCH 02ND, 2017.

      **IMPORTANT NOTE:**
      THIS PRODUCT MUST BE EXPORTED FROM PERU. IT IS NOT PERMITTED TO DELIVER THIS CARGO TO
      ANY PERUVIAN PORT.

      THE DELAY IN THE ARRIVAL OF THE VESSEL IN REGARD TO CONTRACTUAL LAYCAN, EXCEPT IN CASE
      OF FORCE MAJEURE, AS PER ITEM 20 OF PETROPERU'S TENDER TERMS AND CONDITIONS FOR FOB
      EXPORTS AND CFR/FOB IMPORTS OF CRUDE OIL AND PETROLEUM PRODUCTS, IS IMPUTABLE TO THE
      BUYER, PETROPERU S.A WILL CHARGE THE AMOUNT OF US$ 1,200 PER HOUR OR FRACTION. SUCH
      CALCULATION SHALL START FROM 00:00 HOURS OF THE DAY FOLLOWING THE LAST DATE OF THE
      CONTRACTUAL LAYCAN. ADDITIONALLY, BUYER WILL RECOGNIZE PETROPERU S.A ALL THE OPERATIVE
      COSTS INCURRED FOR SUCH DELAY AND PETROPERU S.A RESERVES THE RIGHT TO EXECUTE THE
      INDEMNITY CLAUSE OF THE AWARD.

4.    **PRICE:**

      THE FOB TALARA (INCOTERMS 2000) PRICE TO BE DETERMINED UPON THE AVERAGE OF THE MEAN
      POSTINGS AS PUBLISHED BY PLATT'S OILGRAM U.S. MARKETSCAN FOR + **UNL 87 (CURRENT RVP)**
      **(DATA CODE: PGACU00)** + UNDER + GULF COAST WATERBORNE + AND EFFECTIVE ON B/L DATE OF THE
      CARGO, THE QUOTATION PUBLISHED IMMEDIATELY BEFORE THE B/L DATE AND THE QUOTATION
      PUBLISHED IMMEDIATELY AFTER THE B/L DATE, CONVERTED TO US DOLLARS PER BARREL, MINUS A
      DISCOUNT OF **11.20 US DOLLARS PER BARREL (ELEVEN POINT TWENTY US DOLLARS PER BARREL)**.

      IN THE EVENT THE BILL OF LADING DATE FALL ON A DAY WHEN PLATT'S DOES NOT PUBLISH, THEN FOR
      PRICING PURPOSES ONLY THE PRICE WILL BE CALCULATED UTILIZING THE TWO EFFECTIVE
      PUBLISHED PRICE QUOTES IMMEDIATELY PRIOR TO THE BILL OF LADING DATE AND ONE EFFECTIVE
      PUBLISHED PRICE QUOTE IMMEDIATELY FOLLOWING THE BILL OF LADING DATE. THREE SEPARATE
      EFFECTIVE PUBLISHED PRICE QUOTES SHALL ALWAYS BE USED.

5.    **PAYMENT TERMS:**

      PAYMENT IN ADVANCE AT LEAST TWO (02) DAYS BEFORE START LOADING OPERATION, BASED ON
      MAX. CONTRACTUAL VOLUME (240 MB).

      NOTE: ADJUST PAYMENT WILL BE DONE NO MORE EIGHT (08) WORKING DAYS AFTER BILL OF LADING
      DATE.



**Exhibit E**

" ISO 9001:2008, AT THE FOREFRONT IN CUSTOMER SATISFACTION AND INDUSTRY STANDARDS"
Av. Enrique CanavalMoreyra N° 150,Lima 27 - Perú
Telfs.: (511) 630-4000  / 614-5000
Portal empresarial:www.petroperu.com.pe
Sociedad inscrita en la Partida N°11014754 del Registro de Personas Jurídicas

SSVI-0445-2017

6.    **DOCUMENTATION REQUIREMENTS:**

AS PER ITEM 15 OF PETROPERU'S TENDER TERMS AND CONDITIONS FOR FOB EXPORTS AND CFR/FOB
IMPORTS OF CRUDE OIL AND PETROLEUM PRODUCTS.

7.    **QUALITY VIRGIN NAPHTHA :**

| QUALITY | MIN. | MAX. | PROM. | ASTM METHOD |
|---|---|---|---|---|
| SPECIFIC GRAVITY AT 60 FD | 0,699 | 0,751 | 0,721 | D-1298 |
| RVP AT 100 FD, PSI | -- | 10,0 | 9,1 | D-323 / D-5191 |
| COPPER STRIP CORROSION | -- | 1 | 1a | D-130 |
| SULPHUR, WT. PCT. | -- | 0,015 | 0,003 | D-4294 / D-2622 |
| LEAD, PPB | -- | 40 | 15.0 | IP-224 / D-3116 |
| SAYBOLT COLOR | +20 | -- | +29 | D-156 / D-6045 |
| HYDROC. TYPE, VOL PCT | | | | |
| OLEFINS | -- | 1,0 | 1,0 | D-6730 |
| N+A | 41,0 | -- | 42,7 | D-6730 |
| DISTILLATION, CD | | | | D-86 |
| IBP | 33 | -- | 38,0 | |
| 10 PCT | 60 | -- | 67,0 | |
| 50 PCT | -- | 120 | 100,0 | |
| 90 PCT | -- | 160 | 125,0 | |
| FBP | -- | 170 | 142,0 | |
| Vol. RECOVERED | 96,0 | -- | 97,5 | |
| Vol. RESIDUE | -- | 2,0 | 1,4 | |

*AVERAGE QUALITY FROM JANUARY SINCE DECEMBER 2016

**IMPORTANT NOTE:**
THE QUALITY OF THE PRODUCT MUST BE DETERMINATED BY A REPRESENTATIVE COMPOSITE SHORE
TANK.

8.    **INSPECTION**

ASPER ITEM 8 OF PETROPERU'STENDER TERMS AND CONDITIONS FOR FOB EXPORTS AND CFR/FOB
IMPORTS OF CRUDE OIL AND PETROLEUM PRODUCTS.

9.    **PORT RESTRICTIONS:**

| PORT | DRAFT (FEET) | LOA (FEET) | MAXIMUM DISPLACEMENT |
|---|---|---|---|
| TALARA (LIQUID CARGO DOCK) | 35.00 | 631.00 | 45,000 MT(*) |

(*) ENTRY OR EXIT OF THE PIER

10.    **VESSEL NOMINATION AND DISCHARGE/LOADING PROCEDURES:**

CINQUE TERRE FINANCIAL GROUP LTD. MUST COMPLY WITH ITEM 12.1 (FOB SALE) OF PETROPERU'S
TENDER TERMS AND CONDITIONS FOR FOB EXPORTS AND CFR/FOB IMPORTS OF CRUDE OIL AND
PETROLEUM PRODUCTS.

THE VESSEL MUST COMPLY WITH THE INTERNATIONAL SHIP AND PORT FACILITY SECURITY (ISPS)
CODE, EFFECTIVE JULY 01ST, 2004.

11.    **DEMURRAGE**

AS PER ITEM 12.5 OF PETROPERU'S TENDER TERMS AND CONDITIONS FOR FOB EXPORTS AND
CFR/FOB IMPORTS OF CRUDE OIL AND PETROLEUM PRODUCTS.

DEMURRAGE AND POST DEAL EXPENSE CLAIMS



2

SSVI-0445-2017

PLEASE CONTACT PETROPERU'S DEMURRAGE TEAM WITH SUBJECT LINE TO READ: TYPE OF CLAIM
E.G. PETROPERU DEMURRAGE, DEVIATION CLAIM. VESSEL NAME/ B/L DATE/ LOADPORT AND/OR
DISPORT.

| Contacts | Email |
|---|---|
| Arturo Muñoz Rodriguez | amunoz@petroperu.com.pe |
| Yusko  Toscano Ludena | ytoscano@petroperu.com.pe |

12. **FORCE MAJEURE**

AS PER ITEM 20 OF PETROPERU'S TENDER TERMS AND CONDITIONS FOR FOB EXPORTS AND CFR/FOB
IMPORTS OF CRUDE OIL AND PETROLEUM PRODUCTS.

13. **OTHER TERMS AND CONDITIONS:**

AS PER PETROPERU TENDER TERMS (REVISION OF JULY 2000).

14. **IMPORTANT NOTES:**

A. - ANY INFORMATION GIVEN BY CINQUE TERRE FINANCIAL GROUP LTD. AFTER THE AWARD THAT
MODIFIES THE CONDITIONS OF THE INVITATION AND/OR OUR AWARD WILL BE CONSIDERED A
MATERIAL UNFULLFILLMENT OF THE CONTRACT. UNDER THIS SITUATION, PETROPERU RESERVES
THE RIGHT TO CANCEL THE CONTRACT AND REQUIRE AN INDEMNITY FROM CINQUE TERRE
FINANCIAL GROUP LTD. FOR ANY AND ALL COSTS, DAMAGES OR EXPENSES INCURRED BY
PETROPERU AS A RESULT OF CINQUE TERRE FINANCIAL GROUP LTD.'S FAILURE TO FULFIL ITS
CONTRACTUAL OBLIGATIONS. ADDITIONALLY, PETROPERU RESERVES THE RIGHT TO SUSPEND
OR EXCLUDE FROM OUR TENDER LIST.
B. - PETROPERU REQUIRES THAT CINQUE TERRE FINANCIAL GROUP LTD. PERFORMS ITS
CONTRACTUAL OBLIGATIONS IN A PROFESSIONAL AND RESPONSIBLE WAY; OTHERWISE
PETROPERU RESERVES THE RIGHT TO SUSPEND CINQUE TERRE FINANCIAL GROUP LTD. AND
REQUIRE AN INDEMNITY FROM CINQUE TERRE FINANCIAL GROUP LTD. FOR ANY AND ALL COSTS,
DAMAGES OR EXPENSES INCURRED BY PETROPERU AS A RESULT OF CINQUE TERRE FINANCIAL
GROUP LTD.'S FAILURE TO FULFIL ITS CONTRACTUAL OBLIGATIONS.
C. - THE FAILURE OF THE WINNER TO COMPLY WITH THE THREE DAY LAYCAN, AS PER ITEM 3, WILL BE
CONSIDERED A MATERIAL UNFULFILLMENT OF THE CONTRACT. UNDER THIS SITUATION
PETROPERU MAY APPLY ITEM 14 OF THIS AWARD.

15. THE CONTRACT WILL BE INTEGRATED BY OUR INVITATION SSVI-0364-2017/TENDER-009-2017 DATED
FEBRUARY 06TH, 2017, YOUR OFFER DATED FEBRUARY 09TH 2017, THIS AWARD, AND PETROPERU'S
TENDER TERMS AND CONDITIONS FOR FOB EXPORTS AND CFR/FOB IMPORTS OF CRUDE OIL AND
PETROLEUM PRODUCTS. IT WILL NOT BE ACCEPTED ANY OTHER DOCUMENT OR AGREEMENT.

16. AFTER THE AWARD AND DURING THE ACTIVITIES BEFORE, DURING OR AFTER THE LOADING IF YOU
HAVE ANY COMPLAINT PLEASE WRITE TO THE FOLLOWING ADDRESS: AMUNOZ@PETROPERU.COM.PE
SO WE CAN ASSIST YOU.

PLEASE ACKNOWLEDGE THE RECEIPT OF THIS AWARD BY E-MAIL
BEST REGARDS,

AUGUSTO NÚÑEZ ZELA – MANAGER
INTERNATIONAL TRADE
PETRÓLEOS DEL PERÚ–PETROPERU S.A.

3

Case 1:17-cv-00845   Document 12-1   Filed in TXSD on 04/03/17   Page 4 of 4

# CHEMOIL

**MARINE FUEL DELIVERY RECEIPT**

CHEMOIL LATIN AMERICA INC. •P.H. Plaza Canaima, 19 th Floor •Samuel Lewis Street •Panama
Phone: (507) 265-5070 • Fax (507) 265-5088 • E-mail: gmops@chemoil.com

Nº **8162**

| VESSEL NAME: | IMO # : | BARGE NAME: | DATE: |
|---|---|---|---|
| CENTENARIO TRADER | 7367275 | | AUG. 23 / 2014 |

| LOADING TERMINAL LOCATION: | DELIVERY LOCATION: |
|---|---|

| PRODUCT | GROSS BBLS | NET BBLS | WEIGHT M. TONS |
|---|---|---|---|
| M60 (TK 20) | 16541.19 | 16329.52 | 2211.997 |
| M60 (TK 21) | 1626.56 | 1605.77 | 216.217 |

## PROPERTIES

| GRADE | VISCOSITY CST AT 50ºC/122ºF | API AT 60ºF | DENSITY AT 15ºC | TEMP ºF | FLASH ºF | POUR ºF | WATER % VOL. | SULFUR % M/M | | | DATE | TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M60 (TK20) | 2.738 | 34.2 | 863.5 | 87.0 | 62 | -21 | | 0.154 | BARGE ALONGSIDE | | | |
| M60 (TK21) | 3.069 | 35.2 | 848.4 | 87.8 | 70 | -18 | | 0.292 | HOSE CONNECTED | | | |
| | | | | | | | | | STARTED PUMPING | | | |
| | | | | | | | | | FINISHED PUMPING | | | |
| | | | | | | | | | HOSE DISCONNECTED | | | |
| | | | | | | | | | BARGE AWAY | | | |

**The fuel oil supplied is in conformity with regulation 14 (1) or 4 (a) and regulation 18 (1) of Marpol 73/78 Annex VI**

The marine fuel described herein in delivered in accordance with Chemoil Standard Terms and Conditions of Sale (a copy of which has been provided to buyer prior to delivery) and on credit of the vessel. Any disclaimers as to the creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ship's officer signing this Receipt to bind the vessel and her owner to the above are null and void, unless an authorized representative of Chemoil shall have otherwise agreed in writing at the time Buyer initially orders the marine fuel. Failing such agreement, delivery shall, under no circumstances, constitute a waiver by Chemoil of the above.

REMARKS:

| BARGE SAMPLE (SUPPLIER): | SEAL # | _____ |
|---|---|---|
| BARGE SAMPLE (VESSEL): | SEAL # | _____ |
| MARPOL ANNEX VI SAMPLE: | SEAL # | N/A |
| OTHER SAMPLE: | SEAL # | _____ |

SAMPLES GIVEN TO CUSTOMER   ☐ YES   ☐ REFUSED

GAUGES WITNESSED BY SHIP'S REPRESENTATIVE
☑ BEFORE   ☑ AFTER   ☐ DECLINED

DELIVERING COMPANY:

BY: *Camin Cargo Control, Panama S. A.*
*Luis Mejia*

DATE: Ago 24, 2014

**DECLARATION OF MASTER/CHIEF ENGINEER**
I declare that the information given above is true and correct to the best of my knowledge and belief; that I have Knowledge of the facts set forth herein; that the articles described in the notice of lading were received in the quantities were laden on the vessel named above for use on said vessel as supplies, except as noted below.

Received for use as bunkers, together with representative sample, the quantities show above. Exact quantities shown are subject to correction in case of error:

MASTER/CHIEF ENGINEER: *Sebastian Vargas*

CENTENARIO TRADER
PANAMA

DATE:

White (office) Yellow (office) Pink (office) Green (ship)

**Exhibit D**



# CHEMOIL LATIN AMERICA INC.

## LETTER OF INTRODUCTION

To: Master / Chief Engineer

M/V: CENTENARIO TRADER

Port of Delivery: _____

Date: AUG. 23/2014

Bunker Certificate Nº _____

We are prepared to deliver to your vessel according to the following orders received through your principals.
Please confirm and acknowledge the following:

| Grade of Fuel | API Gravity | Density | Viscocity cst | Quantity | Sulfur |
|---|---|---|---|---|---|
| M60 | 35.2 | 848.4 | 3.089 | 1600 NET | 0.292 |
| Quantity: M60 | 34.2 | 853.5 | 2.738 | 16300 NET | 0.154 |

Fuel to be delivered is based on shore tank quantities (meters, shore tanks). You are hereby invited to witness
opening and closing gauges prior to and after delivery. Remarks on the Bunker Delivery Receipt are not
acceptable if ship representative has not witnessed. If you do not wish to witness the taking of gauges, please
indicate so below.

Quality:
You are also hereby invited to witness the taking of retain samples. Since this is the only sample mutually
witnessed, no other samples privately taken will be accepted as representative of the fuel being delivered. If
you do not wish to witness the taking of the sample, please indicate so below.

Pump Rate:
If you require a slow pump rate, please inform us before the pumping has commenced. Our standard practice
is to start slow and increase the rate as the equipment warms up. If for any reason you are not able to take the
full quantity of the fuel ordered, please indicate below with the reasons.

Thank you for the opportunity to provide to serve you.

CENTENARIO TRADER
PANAMA
Received and acknowledged by:

CHEMOIL LATIN AMERICA INC.

Camin Cargo Control, Panama S. A.
Luis Vivies
Inspector

Rank, C/OFF        Date Aug. 23/2014

|  | YES | NO |
|---|---|---|
| INVITED TO WITNESS SAMPLING | ✓ |  |
| WITNESSED SAMPLING | ✓ |  |
| INVITED TO WITNESS GAUGES | ✓ |  |
| WITNESSED GAUGES | ✓ |  |

# MARINE FUEL DELIVERY RECEIPT

**CHEMOIL**

CHEMOIL LATIN AMERICA INC. •P.H. Plaza Canaima, 19 th Floor •Samuel Lewis Street •Panama
Phone: (507) 265-5070 • Fax (507) 265-5088 • E-mail: gmops@chemoil.com

Nº  7703

| VESSEL NAME: BB Centenario Trader | IMO # : 7367275 | BARGE NAME: | DATE: 08/22/14 |
|---|---|---|---|

| LOADING TERMINAL LOCATION: Decal Panama, Isla Taboguilla | DELIVERY LOCATION: Isla Taboguilla |
|---|---|

| PRODUCT | GROSS BBLS | NET BBLS | WEIGHT M. TONS |
|---|---|---|---|
| MBO | 22,917.44 | 22,611.89 | 3044.691 |
| | | | |
| | | | |

## PROPERTIES

| GRADE | VISCOSITY CST AT 50°C/122°F | API AT 60°F | DENSITY AT 15°C | TEMP °F | FLASH °F | POUR °F | WATER % VOL. | SULFUR % M/M |   | DATE | TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MGO | 3.059 | 35.2 | 848.4 | 87.8 | 70 | -18 | | 0.292 | BARGE ALONGSIDE | 08/20/14 | 1820 |
| | | | | | | | | | HOSE CONNECTED | 08/20/14 | 1935 |
| | | | | | | | | | STARTED PUMPING | 08/20/14 | 2100 |
| | | | | | | | | | FINISHED PUMPING | 08/21/14 | 2230 |
| | | | | | | | | | HOSE DISCONNECTED | 08/21/14 | 2300 |
| | | | | | | | | | BARGE AWAY | 08/22/14 | 0156 |

**The fuel oil supplied is in conformity with regulation 14 (1) or 4 (a) and regulation 18 (1) of Marpol 73/78 Annex VI**

The marine fuel described herein in delivered in accordance with Chemoil Standard Terms and Conditions of Sale (a copy of which has been provided to buyer prior to delivery and on credit of the vessel. Any disclaimers as to the creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ship's officer signing this Receipt to bind the vessel and her owner to the above are null and void, unless an authorized representative of Chemoil shall have otherwise agreed in writing at the time Buyer initially orders the marine fuel.  Failing such agreement, delivery shall, under no circumstances, constitute a waiver by Chemoil of the above.

REMARKS:

| BARGE SAMPLE (SUPPLIER): | SEAL # _____ |
|---|---|
| BARGE SAMPLE (VESSEL): | SEAL # _____ |
| MARPOL ANNEX VI SAMPLE: | SEAL # N/A |
| OTHER SAMPLE: | SEAL # _____ |

SAMPLES GIVEN TO CUSTOMER    ☐ YES  ☐ REFUSED

GAUGES WITNESSED BY SHIP'S REPRESENTATIVE
☑ BEFORE  ☑ AFTER  ☐ DECLINED

DELIVERING COMPANY:

BY: Duncer F. Williams Co.    On behalf of Chemoil

DATE: 08/22/14

DECLARATION OF MASTER/CHIEF ENGINEER
I declare that the information given above is true and correct to the best of my knowledge and belief; that I have Knowledge of the facts set forth herein; that the articles described in the notice of lading were received in the quantities were laden on the vessel named above for use on said vessel as supplies, except as noted below.

Received for use as bunkers, together with representative sample, the quantities shown above.  Exact quantities shown are subject to correction in case of error:

MASTER/CHIEF ENGINEER: Sebastian Vargos

DATE: CENTENARIO TRADER
PANAMA

White (office) Yellow (office) Pink (office) Green (ship)

**Exhibit C**



## CHEMOIL LATIN AMERICA INC.

### LETTER OF INTRODUCTION

To: Master / Chief Engineer

M/V: BB Centenario Trader

Port of Delivery: DECAL

Date: 08/20/14

Bunker Certificate N° _____

We are prepared to deliver to your vessel according to the following orders received through your principals.
Please confirm and acknowledge the following:

| Grade of Fuel | API Gravity | Density | Viscocity cst | Quantity | Sulfur |
|---|---|---|---|---|---|
| F.O. #2 | 35.2 | 8484 | 3.059 | 22,600 net | 0.292 |

**Quantity:**
Fuel to be delivered is based on shore tank quantities (meters, shore tanks). You are hereby invited to witness
opening and closing gauges prior to and after delivery. Remarks on the Bunker Delivery Receipt are not
acceptable if ship representative has not witnessed. If you do not wish to witness the taking of gauges, please
indicate so below.

**Quality:**
You are also hereby invited to witness the taking of retain samples. Since this is the only sample mutually
witnessed, no other samples privately taken will be accepted as representative of the fuel being delivered. If
you do not wish to witness the taking of the sample, please indicate so below.

**Pump Rate:**
If you require a slow pump rate, please inform us before the pumping has commenced. Our standard practice
is to start slow and increase the rate as the equipment warms up. If for any reason you are not able to take the
full quantity of the fuel ordered, please indicate below with the reasons.

Thank you for the opportunity to provide to serve you.

**CHEMOIL LATIN AMERICA INC.**

On behalf of Chemoil
Canin Cargo Control, Panama S.A.
Dumer E. Williams G.
Inspector

Received and acknowledged by:

_____    Rank, C/O    Date 8/20/14

| | YES | NO |
|---|---|---|
| INVITED TO WITNESS SAMPLING | ✓ | |
| WITNESSED SAMPLING | ✓ | |
| INVITED TO WITNESS GAUGES | ✓ | |
| WITNESSED GAUGES | ✓ | |

DATE:  AUGUST 15TH, 2014.

TO: CINQUE TERRE FINANCIAL GROUP, LTD.
ATTN:  CONTRACT ADMINISTRATION
FROM: CHEMOIL LATIN AMERICA, INC

SALE BY CHEMOIL LATIN AMERICA: REF # 2000383 TO CINQUE TERRE
FINANCIAL GROUP, LTD. # (PLEASE ADVISE)

FOB DECAL TABOGUILLA, FOR 40,000 BARRELS +/-10% BUYER'S
OPTION OF MGO.  AUGUST 18-20, 2014.



---

CHEMOIL LATIN AMERICA IS PLEASED TO CONFIRM THE FOLLOWING TRANSACTION CONCLUDED BETWEEN
OUR TWO COMPANIES ON AUGUST 15TH, 2014.  THIS CONTRACT SUPERSEDES ALL BUYER CONFIRMATIONS
REGARDING THIS TRANSACTION.

**1. BUYER**
CINQUE TERRE FINANCIAL GROUP, LTD
CRAGMUIR CHAMBERS, ROAD TOWN
TORTOLA, BVI

**2. SELLER**
CHEMOIL LATIN AMERICA
P.H. PLAZA CANAIMA, 19TH FLOOR
SAMUEL LEWIS STREET, OBARRIO
PANAMA, REP. OF PANAMA

**3. PRODUCT**
MGO

**4. QUALITY**
MGO: DMA SPECS

**5. QUANTITY**
40,000 BARRELS +/- 10% BUYER'S OPTION

**6. DELIVERY**
FOB VIA PUMP OUT FROM DECAL TABOGUILLA (TWO BARGE LOADINGS), PANAMA ON AUGUST 19-28, 2014.

**ISPS COMPLIANCE CLAUSE: FOB PROVISIONS**

I) BUYERS SHALL PROCURE THAT THE VESSEL SHALL COMPLY WITH THE REQUIREMENTS OF THE
INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF  PORT FACILITIES AND THE RELEVANT
AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) AND WHERE THE LOADING PORT IS WITHIN THE USA
AND US TERRITORIES OR WATERS, WITH THE US MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA),

II) THE VESSEL SHALL WHEN REQUIRED SUBMIT A DECLARATION OF SECURITY (DOS) TO THE APPROPRIATE
AUTHORITIES PRIOR TO ARRIVAL AT THE LOADING PORT.

III) NOTWITHSTANDING ANY PRIOR ACCEPTANCE OF VESSEL BY SELLER, IF AT ANY TIME PRIOR TO THE
PASSING OF RISK AND TITLE THE VESSEL CEASES TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE
OR MTSA:

A) SELLER SHALL HAVE THE RIGHT NOT TO BERTH SUCH NOMINATED VESSEL AND ANY DEMURRAGE
RESULTING SHALL NOT BE FOR THE ACCOUNT OF THE SELLER.

B) BUYER SHALL BE OBLIGED TO SUBSTITUTE SUCH NOMINATED VESSEL WITH A VESSEL COMPLYING WITH
THE REQUIREMENTS OF THE ISPS CODE AND MTSA.

IV)
A) SELLERS SHALL PROCURE THAT THE LOADING PORT/TERMINAL/INSTALLATION SHALL COMPLY WITH THE
REQUIREMENTS OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND
THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) AND IF LOCATED WITHIN THE USA AND
US TERRITORIES, WITH THE US MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA).

B) ANY COSTS OR EXPENSES IN RESPECT OF THE VESSEL INCLUDING DEMURRAGE OR ANY ADDITIONAL
CHARGE, FEE OR DUTY LEVIED ON THE VESSEL AT THE LOADING PORT AND ACTUALLY INCURRED BY BUYER

a member of the Chemoil Group of Companies

DELIVERING ENERGY



RESULTING DIRECTLY FROM THE FAILURE OF THE LOADING PORT/TERMINAL/INSTALLATION TO COMPLY
WITH THE ISPS CODE AND IF LOCATED WITHIN THE USA AND US TERRITORIES, WITH THE MTSA, SHALL BE
SHARED EQUALLY BY BUYERS AND SELLERS, INCLUDING BUT NOT LIMITED TO THE TIME REQUIRED OR
COSTS INCURRED BY THE VESSEL IN TAKING ANY ACTION OR ANY SPECIAL OR ADDITIONAL SECURITY
MEASURES  REQUIRED BY THE ISPS CODE OR MTSA.

V) SAVE WHERE THE VESSEL HAS FAILED TO COMPLY WITH THE REQUIREMENTS OF THE INTERNATIONAL
CODE FOR THE SECURITY OF SHIPS AND OF  PORT FACILITIES AND THE RELEVANT AMENDMENTS TO
CHAPTER XI OF SOLAS (ISPS CODE) AND WITHIN THE USA AND US TERRITORIES OR WATERS, WITH THE US
MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA), THE BUYER SHALL BE RESPONSIBLE FOR ANY
DEMURRAGE ACTUALLY INCURRED BY THE BUYER ARISING FROM DELAY TO THE VESSEL AT THE LOADING
PORT RESULTING DIRECTLY FROM THE VESSEL BEING REQUIRED BY THE PORT FACILITY OR ANY RELEVANT
AUTHORITY TO TAKE ANY ACTION OR  ANY SPECIAL OR ADDITIONAL SECURITY MEASURES OR UNDERGO
ADDITIONAL INSPECTIONS BY VIRTUE OF THE VESSEL'S PREVIOUS PORTS OF CALL.
VI) THE SELLER'S LIABILITY TO THE BUYER UNDER THIS AGREEMENT FOR ANY COSTS, LOSSES OR EXPENSES
INCURRED BY THE VESSEL, THE CHARTERERS OR THE VESSEL OWNERS RESULTING FROM THE FAILURE OF
THE LOADING PORT/TERMINAL/INSTALLATION TO COMPLY WITH THE ISPS CODE OR MTSA SHALL BE LIMITED
TO THE PAYMENT OF DEMURRAGE AND PORT COSTS ACTUALLY INCURRED BY THE BUYER IN ACCORDANCE
WITH THE PROVISIONS OF THIS CLAUSE.

**7.  PRICE**
THE FOB PRICE WILL BE THE AVERAGE PRICE (LOW AND HIGH) QUOTATIONS OF NO.2 WATERBORNE AS
PUBLISHED BY PLATT'S OILGRAM US MARKETSCAN.  PRICING SHALL BE THE EFFECTIVE POSTING FOR
AUGUST 19, 20, 21, 2014, PLUS A PREMIUM OF 17.0 CENTS PER GALLON.

FINAL PRICE TO BE CALCULATED TO FOUR DECIMAL PLACES. IF THE FIFTH DECIMAL PLACE IS FIVE OR
GREATER THAN FIVE, THE FOURTH DECIMAL PLACE SHALL BE ROUNDED UP TO THE NEXT DIGIT.  IF THE FITH
DECIMAL PLACE IS LESS THAN FIVE, THE FOURTH DECIMAL PLACE SHALL REMAIN UNCHANGED.

**8.  PAYMENT**
PAYMENT OF FINAL INVOICE VIA TELEGRAPHIC WIRE TRANSFER OF THE FULL INVOICED AMOUNT IN FEDERAL
USA DOLLAR FUNDS WITHOUT DEDUCTION, OFF-SET OR COUNTERCLAIM, INCLUDING BANKING FEES OR
WIRE TRANSFER FEES, TO SELLER'S BANK THREE (3) CALENDAR DAYS AFTER RECEIPT OF INVOICE,
DELIVERY RECEIPT (BDR),  ALONG WITH INDEPENDENT INSPECTOR'S QUANTITY AND QUALITY REPORT.

IN THE EVENT THAT PAYMENT IS NOT RECEIVED INTO OUR NOMINATED BANK ACCOUNT ON THE DUE DATE,
BUYER WILL BE CHARGED INTEREST ON THE OUTSTANDING BALANCE (AT THE 30 DAY LIBOR RATE AS
QUOTED BY SELLER'S NOMINATED BANK),  ON THE DATE PAYMENT IS DUE PLUS 5 PERCENT) UNTIL THE
DATE PAYMENT IS RECEIVED INTO SELLER'S NOMINATED BANK ACCOUNT.

**9.  CREDIT**
STANDBY LETTER OF CREDIT IS REQUIRED, PRIOR TO COMMENCEMENT OF LOAD.

**10.  DETERMINATION OF QUANTITY AND QUALITY**
DETERMINATION OF QUALITY SHALL BE ASCERTAINED AND VERIFIED BY THE MUTUALLY AGREED
INDEPENDENT INSPECTOR, BY LABORATORY ANALYSIS OF SELLER'S REPRESENTATIVE SHORE TANK(S)
COMPOSITE CARGO SAMPLE TAKEN PRIOR TO LOAD/TRANSFER.

DETERMINATION OF QUANTITY SHALL BE ASCERTAINED AND VERIFIED BY THE LOAD PORT INDEPENDENT
INSPECTOR APPOINTED BETWEEN SELLER AND BUYER, BY MEASUREMENT BASED ON DELIVERING SHORE
TANK DOWNGAUGE (NET BARREL AT 60 DEG F IN ACCORDANCE WITH TABLE 6B OF ASTM DESIGNATION D-
1250) AS CERTIFIED BY THE INDEPENDENT INSPECTOR.

ANY INDEPENDENT INSPECTOR SELECTED TO MAKE QUANTITY DETERMINATIONS REGARDING THIS CARGO
IS TO BE MUTUALLY APPOINTED BY BUYER AND THE INSPECTOR'S FINDINGS SHALL BE FINAL AND BINDING
ON BOTH PARTIES, SAVE FRAUD OR MANIFEST ERROR.  INSPECTION COSTS ARE TO BE BORNE BY BUYER.

**11.  PROPERTY/TITLE**
PROPERTY OF THE OIL DELIVERED UNDER THIS AGREEMENT SHALL PASS FROM SELLER TO BUYER AS THE
OIL PASSES THE DELIVERING THE SELLER'S SHORE TANK(S) PERMANENT OUTGOING FLANGE CONNECTION
AT LOAD PORT.

IRREVOCABLE ACCEPTANCE OCCURS WHEN TITLE TRANSFERS FROM SELLER TO BUYER.  SELLER'S TOTAL
LIABILITY UNDER THIS AGREEMENT FOR ANY CLAIMS OF ANY NATURE SHALL NOT EXCEED THE PURCHASE
PRICE OF THAT PORTION OF THE PRODUCT WITH RESPECT TO THE CLAIM THAT IS MADE. BLENDING OF THE
PRODUCT WITH OTHER PRODUCTS OR USE OF TRANSPORTATION OR SPECIALIZED EQUIPMENT SHALL NOT
EFFECT THIS LIMITATION.  IN NO EVENT WILL SELLER BE LIABLE FOR INDIRECT, CONSEQUENTIAL, OR
PUNITIVE DAMAGES.

**12. LIABILITY**

Case 1:16-cv-00845-LPS   Document 129-1   Filed 05/04/17   Page 30 of 37

IRREVOCABLE ACCEPTANCE OCCURS WHEN TITLE TRANSFERS FROM SELLER TO BUYER.  SELLER'S TOTAL LIABILITY UNDER THIS AGREEMENT FOR ANY CLAIMS OF ANY NATURE SHALL NOT EXCEED THE PURCHASE PRICE OF THAT PORTION OF THE PRODUCT WITH RESPECT TO THE CLAIM THAT IS MADE.  BLENDING OF THE PRODUCT WITH OTHER PRODUCTS OR USE OF TRANSPORTATION OR SPECIALIZED EQUIPMENT SHALL NOT EFFECT THIS LIMITATION.  IN NO EVENT WILL SELLER BE LIABLE FOR INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES OR FOR SPECIFIC PERFORMANCE.

**13. WARRANTIES**
THERE ARE NO GUARANTEES, CONDITIONS, WARRANTIES OR REPRESTATIONS, EXPRESS OR IMPLIED, GIVEN IN RELATION TO THE QUALITY, MERCHANTABILITY, FITNESS OR SUITABILITY OF THE OIL, FOR ANY PARTICULAR PURPOSE OR OTHERWISE, WHICH EXTEND BEYOND THE DESCRIPTION OF THE OIL AND ANY SPECIFICATIONS CONTAINED IN THIS CONTRACT.

**14. EXPORT/IMPORT DUTIES**
THE BUYER SHALL BE RESPONSIBLE FOR IMPORTATION COSTS, DUTIES, AND FEES WHICH INCLUDE, BUT ARE NOT LIMITED TO THE FOLLOWING: ALL FEDERAL, STATE, AND LOCAL EXCISE, GROSS RECEIPTS, SUPERFUND, AND FUEL TAXES, HOWEVER DESIGNATED, OTHER THAN TAXES ON INCOME, PAID OR INCURRED BY SELLER DIRECTLY OR INDIRECTLY WITH RESPECT TO THE OIL OR PRODUCT BEING SOLD HEREUNDER AND/OR THE VALUE THEREOF.  IF BUYER IS EXEMPT FROM ANY OF THE AFOREMENTIONED CHARGES, BUYER SHALL PROVIDE SELLER WITH THE APPLICABLE EXEMPTION CERTIFICATES.

THE BUYER ACKNOWLEDGES RESPONSIBILITY FOR AND AGREES TO INDEMNIFY THE SELLER THEIR SUPPLIER, AND/OR THE OWNER OF THE BONDED PREMISES FROM WHICH THE GOODS ARE DISPATCHED AGAINST ALL LIABILITY FOR ANY TAXES, DUTIES AND CHARGES (INCLUDING WITHOUT LIMITATION VAT, EXCISE DUTY AND MINERAL OIL TAX) AND INTEREST PENALTIES OR OTHER COSTS, WHETHER LEVIED DIRECTLY OR INDIRECTLY, RELATING TO THE PRODUCTS SUPPLIED UNDER THE AGREEMENT, OR ON THE SELLER AS A CONSEQUENCE OF THIS AGREEMENT.

**15. LAW AND JURISDICTION**
THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED AND ENFORCED UNDER THE LAWS OF ENGLAND. ALL PARTIES HERETO IRREVOCABLY AGREE THAT THE COURTS OF ENGLAND ARE TO HAVE JURISDICTION TO SETTLE ANY DISPUTE WHICH MAY ARISE OUT OF OR IN CONNECTION  WITH THIS CONTRACT AND SUBMIT TO THE JURISDICTIONS OF THOSE COURTS WITHOUT RECOURSE TO ARBITRATION.

EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT. THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE TRADING SALE OF GOODS SHALL NOT APPLY TO THIS CONTRACT.

**16. LIQUIDATION/DEFAULT**
WITHOUT LIMITING ANY OTHER RIGHTS THAT MAY BE AVAILABLE TO THE LIQUIDATING PARTY (AS HEREINAFTER DEFINED), IN THE EVENT THAT A PARTY HERETO (THE DEFAULTING PARTY) IS THE SUBJECT OF BANKRUPTCY, INSOLVENCY OR OTHER SIMILAR PROCEEDINGS OR FAILS TO PAY ITS DEBTS GENERALLY AS THEY BECOME DUE, THE OTHER PARTY HERETO (THE LIQUIDATING PARTY) SHALL HAVE THE RIGHT, EXERCISABLE IN ITS SOLE DISCRETION AND AT ANY TIME, TO LIQUIDATE THIS AND ANY OR ALL OTHER THEN OUTSTANDING BETWEEN SELLER AND BUYER (WHETHER THE LIQUIDATING PARTY IS THE SELLER OR BUYER UNDER THIS AGREEMENT) BY DECLARING ANY OR ALL SUCH CONTRACTS TERMINATED (WHEREUPON THEY SHALL BECOME AUTOMATICALLY TERMINATED, EXCEPT FOR THE PAYMENT OBLIGATION REFERRED TO BELOW), CALCULATING ITS LOSSES AND COSTS (OR GAINS) AT SUCH TIME IN U.S. DOLLARS, WHICH LIQUIDATING PARTY INCURS AS A RESULT OF THE LIQUIDATION OF SUCH TRANSACTION(S) (OTHER THAN CONSEQUENTIAL DAMAGES) INCLUDING (THE ELECTIONS OF THE LIQUIDATING PARTY) WITHOUT LIMITATION ALL LOSSES AND COSTS WHICH SUCH PARTY INCURS AS A RESULT OF ITS MAINTAINING, TERMINATING AND/OR RE-ESTABLISHING ANY HEDGE OR RELATED TRADING POSITIONS (AS DETERMINED BY THE LIQUIDATING PARTY IN A COMMERCIALLY REASONABLE MANNER AT A TIME OR TIMES REASONABLY DETERMINED BY THE LIQUIDATING PARTY), AND AGGREGATING OR NETTING SUCH MARKET DAMAGES TO A SINGLE LIQUIDATED SETTLEMENT PAYMENT THAT WILL BE DUE AND PAYABLE UPON DEMAND THEREFORE.

**17. FORCE MAJEURE**
NEITHER PARTY SHALL BE LIABLE TO THE OTHER IN DAMAGES OR OTHERWISE FOR ANY DELAY IN PERFORMANCE OR FAILURE (IN WHOLE OR IN PART) TO PERFORM ANY OF THE TERMS OF THIS AGREEMENT, SAVE FOR ANY OBLIGATION TO PAY MONEY (INCLUDING DEMURRAGE) UNDER THIS AGREEMENT, TO THE EXTENT THAT SUCH FAILURE OR DELAY ARISES FROM ANY CAUSE WHATSOEVER BEYOND THAT PARTY'S CONTROL, INCLUDING (BUT WITHOUT LIMITING THE GENERALITY OF THE FOREGOING): ANY RESTRICTION ON, FAILURE OF, OR DEFAULT BY THE SELLER'S INTENDED SOURCE OF SUPPLY, ANY DELAY OR FAILURE IN PERFORMANCE BY THE OWNERS/DISPONENT OWNERS OF A SHIP, DELAY OF CARRIER DUE TO BREAKDOWN OR ADVERSE WEATHER, ACT OF GOD, PERILS OF THE SEA, ADVERSE WEATHER CONDITIONS, EXPLOSION, WAR (DECLARED OR UNDECLARED), MILITARY OPERATIONS, BLOCKADE, REVOLUTION, DISTURBANCE, TRADE RESTRICTION, REQUESTS OR ORDERS OR ACTION BY ANY GOVERNMENT OR GOVERNMENTAL OR CIVIL OR MILITARY AUTHORITY, EMBARGO, STRIKE, LOCK-OUT OR LABOUR DISPUTE, FIRE, ICE CONDITIONS, PROHIBITIONS ON IMPORT OR EXPORT, DELAYS TO CARRIERS AND BREAKDOWN OF SAME, OR ANY OTHER CAUSE COMPREHENDED IN THE TERM FORCE MAJEURE.

THE PARTY SEEKING TO RELY ON THIS CLAUSE SHALL PROMPTLY NOTIFY THE OTHER PARTY OF ANY SUCH EVENT, ALTHOUGH FAILURE TO DO SO SHALL NOT PRECLUDE RELIANCE ON THIS CLAUSE.

SHOULD ANY OF THE FOREGOING CIRCUMSTANCES OCCUR, THE TIME FOR PERFORMANCE OF THE AFFECTED OBLIGATIONS (INCLUDING THE OBLIGATION TO DELIVER) SHALL BE EXTENDED DURING THE PERIOD OF SUCH HINDRANCE OR DELAY UP TO A MAXIMUM OF THIRTY (30) DAYS.  SHOULD ANY DELAY OR FAILURE TO PERFORM ARISING FROM ANY OF THE FOREGOING CIRCUMSTANCES CONTINUE FOR A PERIOD OF MORE THAN THIRTY (30) DAYS, EITHER PARTY SHALL HAVE THE RIGHT TO TERMINATE THE CONTRACT BY NOTICE TO THE OTHER PARTY, IN WHICH CASE NEITHER PARTY SHALL BE RESPONSIBLE FOR FURTHER PERFORMANCE OF THE CONTRACT OF FOR DAMAGES IN RESPECT OF SUCH FAILURE TO PERFORM.

**18.  OTHER TERMS**
WHERE NOT INCONSISTENT WITH THE TERMS OF THIS CONTRACT, INCOTERMS 2000 FOB SALES, WITH ALL LATER AMENDMENTS SHALL APPLY.

THIS TRANSACTION SHALL REMAIN PRIVATE AND CONFIDENTIAL BY ALL PARTIES INVOLVED.

**19.  NOTIFICATIONS**
ALL MAILING CORRESPONDENCE IS TO BE MADE TO THE FOLLOWING REPRESENTATIVES AT:

CHEMOIL INTERNATIONAL PTE LTD
1 TEMASEK AVENUE
36-01 MILLENIA TOWER
SINGAPORE 039192

FINANCE
E-MAIL: finance@chemoil.com

OPERATION AND CONTRACTS
WILFREDO GLASSE
PHONE: ++507 265 5070 EXT. 106 (PANAMA)
MOBILE: ++507 6679 3374 (PANAMA)
FAX: ++41 44 274 2982 (SWITZERLAND)
E-MAIL: claops@chemoil.com / contract.intl@chemoil.com

**20.  ENTIRE AGREEMENT**
THIS CONTRACT CONTAINS THE ENTIRE AGREEMENT OF BOTH PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND ALL REPRESENTATIONS RELATING THERETO ARE MERGED HEREIN.  THIS CONTRACT CANNOT BE MODIFIED UNLESS IN WRITING BY SELLER.

**21.  CONFIRMATION**
IF ANY OF THE ABOVE IS CONTRARY TO YOUR UNDERSTANDING OF THE VERBAL AGREEMENT OF THE PARTIES' REPRESENTATIVES REGARDING THIS TRANSACTION, PLEASE RESPOND IMMEDIATELY VIA FACSIMILE WITH YOUR SPECIFIC POINTS OF DISAGREEMENT.  IN THE EVENT THAT NO SUCH NOTIFICATION IS RECEIVED BY THE CLOSE OF BUSINESS IN THE NEXT 2 BUSINESS DAYS FROM THE DATE OF THIS DOCUMENT, THE PROVISIONS SET FORTH IN THIS CONTRACT SHALL BECOME FINAL AND CONCLUSIVE EVIDENCE OF ALL THE TERMS OF THE BINDING AGREEMENT REGARDING THIS TRANSACTION.  IF BUYER NOTIFIES SELLER OF ADDITIONAL OR DIFFERENT TERMS FROM THOSE SET FORTH HEREIN, THOSE TERMS SHALL BE CONSTRUED ONLY AS PROPOSALS FOR AMENDMENTS TO THIS AGREEMENT AND SHALL NOT BECOME PART OF THIS AGREEMENT UNLESS EXPRESSLY AGREED BY SELLER IN A SUPPLEMENTAL WRITTEN CONFIRMATION.

WE ARE PLEASED TO HAVE CONCLUDED THIS BUSINESS TRANSACTION WITH YOU AND LOOK FORWARD TO YOUR WRITTEN CONFIRMATION OF RECEIPT OF AND AGREEMENT TO THIS SALES CONTRACT WHICH IS TO BE SENT TO FAX: ++41 44 274 2982.

BEST REGARDS,
CHEMOIL LATIN AMERICA INC.

16-11086-jlg    Doc 152-1    Filed 07/29/17    Entered 07/29/17 13:25:55    Exhibit A
Chemoil Garnishment Action    Amended Complaint    Allegations Against E    Pg 32 of 37

16-11086-jlg    Doc 404-2    Filed 08/21/16    Entered 06/29/16 14:20:17    Main Document
Pg 1 of 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
                              :     Chapter 15
In re:                          :
                              :     Case No. 16-11086 (JLG)
CINQUE TERRE FINANCIAL GROUP  :
LIMITED,                    :
                              :
           Debtor in a          :
           Foreign Proceeding.  :
                              :
----------------------------------------------------------x

**ORDER GRANTING RECOGNITION AND RELIEF IN AID OF
FOREIGN MAIN PROCEEDING PURSUANT TO 11 U.S.C. §§ 1504, 1507, 1509, 1515,
<u>1517, 1520 AND 1521 OF THE BANKRUPTCY CODE</u>**

       THIS CASE came on for hearing before the United States Bankruptcy Court of the
Southern District of New York on June 21, 2016 (the "**Hearing**") to consider the application of
Stuart MacKellar, in his capacity as the duly appointed liquidator ("**Liquidator**") of Cinque
Terre Financial Group Limited  ("**Cinque Terre**"), a company undergoing liquidation before the
Eastern Caribbean Supreme Court High Court of Justice, Virgin Islands Commercial Division
(the "**BVI Court"**), claim number BVIHC (COM) 139 of 2015 (the "**BVI Liquidation**"),
pursuant to Section 162 of the British Virgin Islands Insolvency Act of 2003 (the "**2003 Act**"),
seeking relief chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the
"**Bankruptcy Code**").

       The Court has considered the Official Form Petition, the Verified Petition (together, the
"**Petition**"), the Declaration of Stuart MacKellar, (the "**MacKellar Declaration**"), the
Declaration of Andrew Thorp, as to BVI law (the "**Thorp Declaration**"), the record in this
matter from the prior hearings on the Liquidator's request for provisional relief, the prior orders
of this Court in this matter, and the evidence proffered by the Liquidator at the Hearing.

**Exhibit A**

By notice dated May 12, 2016, the Hearing was scheduled and the deadline to file written objections to the application and Petition was set for June 14, 2016.  No written objection was filed by any party in interest other than an answer filed by Tacopina & Seigel, former legal counsel for Cinque Terre, to the summons issued to them by the Liquidator because provisional relief was requested of them and the Liquidator had requested the alternative relief of foreign non-main recognition.  The answer expresses a lack of knowledge of the allegations of the Petition, raises no contest or defense to recognition of the BVI Liquidation as a foreign main proceeding, and raises no contest or defense to the relief sought in the Petition.

Accordingly, after due deliberation, the Court makes the following findings of fact and conclusions of law:

A.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

B.      Venue of this proceeding is proper in this judicial district under  28 U.S.C. § 1410 (1) and (2) because Cinque Terre has property in the United States and because Cinque Terre is a defendant in an action pending in this District.

C.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D.      The Liquidator is the duly appointed "foreign representative" of Cinque Terre under 11 U.S.C. § 101(24).

E.      This chapter 15 case was properly commenced under 11 U.S.C. §§ 1504, 1509 and 1515.

F.      Cinque Terre satisfies the requirements of 11 U.S.C. § 109 as it has property in the United States.

16-11086-jlg    Doc 90-4    Filed 06/23/16    Entered 06/23/16 14:20:42    Main Document
Pg 3 of 6

    G.      The Liquidator has satisfied the requirements of 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

    H.      The BVI Liquidation is a "foreign proceeding" under 11 U.S.C. § 101(23).

    I.      The BVI Liquidation is entitled to recognition by this Court under 11 U.S.C. § 1517.

    J.      The BVI Liquidation is pending in the British Virgin Islands, the country where Cinque Terre's center of main interests is located, and accordingly the BVI Liquidation is a "foreign main proceeding" under 11 U.S.C. § 1502(4), and is entitled to recognition as a "foreign main proceeding" under 11 U.S.C. § 1517(b)(1).

    K.      The Liquidator is entitled to all of the relief provided under 11 U.S.C. § 1520 without limitation.

    L.      The Liquidator is entitled to all the relief under 11 U.S.C. §§ 1507 and 1521 including, without limitation, the discovery and turnover relief set forth below.

    M.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520, and 1521.

**NOW, THEREFORE, IT IS HEREBY**

    1.      **ORDERED** that the BVI Liquidation is recognized as a foreign main proceeding under 11 U.S.C. § 1517(b)(1); and it is further

    2.      **ORDERED** that the Liquidator is recognized as the foreign representative of Cinque Terre in the United States under 11 U.S.C. §1509; and it is further

    3.      **ORDERED** that 11 U.S.C. § 1520 is effective with respect to the BVI Liquidation.

16-11086-jlg Doc 204-5 Filed 06/29/18 Entered 06/29/18 14:09:43 Main Document Pg 35 of 37

4.     **ORDERED** that under 11 U.S.C. § 1520(a) all litigation pending against Cinque Terre in the United States is stayed; and it is further

5.     **ORDERED** that 11 U.S.C. § 1521(a)(1-4) is effective with respect to the BVI Liquidation and the stay, as provided for by Section 175(c) of the 2003 Act, shall be effective in the United States under 11 U.S.C. § 1507; and it is further

6.     **ORDERED** that upon written request served by the Liquidator, all persons or entities subject to the jurisdiction of this Court, including but not limited to Cinque Terre's former officers, directors, employees, representatives, legal advisors, shareholders, members, subsidiaries, counterparties, financial institutions, investment advisors and accountants, are directed to turnover any and all documents, records, filings, or other information, regarding the assets, affairs, rights, obligations or liabilities of Cinque Terre however stored, so long as they are accessible by persons in the United States,; and it is further

7.     **ORDERED** that the Liquidator is hereby granted authority to assert claims of Cinque Terre against parties that are subject to jurisdiction in the United States, including but not limited to claims predicated upon fraudulent conveyance or veil piercing not otherwise prohibited under 11 USC §1521(2)(7); and it is further

8.     **ORDERED** that the administration or realization of all or part of the assets of Cinque Terre within the territorial jurisdiction of the United States is hereby entrusted to the Liquidator and the Liquidator is hereby established as the exclusive representative of Cinque Terre in the United States; and it is further

9.     **ORDERED** that the Liquidator is authorized to issue subpoenas for oral examination and production of documents under Fed.R.Bankr.P. 2004 concerning the records, assets, affairs, rights, obligations or liabilities of Cinque Terre and shortening the

16-11086-jlg    Doc 90-2    Filed 08/24/16    Entered 08/24/16 14:09:42    Main Document
Pg 36 of 37

number of days to appear for the examination and produce the documents to fourteen (14) days

from the date of service on (a) Cinque Terre's current and former officers, directors, employees,

representatives, legal advisors, shareholders, members, subsidiaries, contractual counterparties,

investment advisors and accountants, (b) financial institutions where Cinque Terre may have had

accounts or holdings, or which may have processed USD wire transfers originating from, for the

benefit of or relating to Cinque Terre, its shareholders, members, subsidiaries, contractual

counterparties, investment advisors and accountants; and (c) persons or entities the Liquidator

has a good faith basis to believe may be holding property or records of Cinque Terre or may

have knowledge of others who are holding property or records of Cinque Terre; and it is further

10.    **ORDERED** that all persons and entities subject to the jurisdiction of this Court,

are enjoined from destroying, secreting, altering, deleting or otherwise disposing of any

documents, records, emails, filings, or other information, however stored, concerning or relating

to the assets, affairs, rights, obligations or liabilities of Cinque Terre and such persons and

entities, and such persons and entities are directed to provide access to such documents, records,

emails, or information via the applicable electronic means to the Liquidator; and it is further

11.    **ORDERED** that all persons and entities subject to the jurisdiction of this Court

are enjoined from moving or otherwise disposing of Cinque Terre's assets or records within the

territorial jurisdiction  of the United States outside the jurisdiction of this Court except for

production to the Liquidator;

12.    **ORDERED** that notwithstanding any other provision of this order to the contrary,

with respect to Mr. Richard Rothenberg all of the relief provisionally granted against him in this

Court's prior Order (D.E. 9) as thereafter modified by and subject to this Court's Order On

Motion to Vacate and To Quash dated June 3, 2016 (D.E. 73) remains in effect; and it is further

16-11086-jlg   Doc 104-2   Filed 06/29/16   Entered 06/29/16 14:29:47   Main Document
Pg 9 of 9

13.    **ORDERED** that this Court retains jurisdiction with respect to the enforcement,
amendment or modification of this Order, any requests for additional relief or any adversary
proceeding brought in and through this chapter 15 case, and any request by an entity for relief
from the provisions of this Order, for cause shown, that is properly commenced and within the
jurisdiction of this Court; and it is further

14.    **ORDERED**, that the Liquidator will serve this Order on counsel for Centauro
(Boies, Schiller & Flexner LLP), former counsel for Cinque Terre (Tacopina, Seigel & Turano,
P.C.), counsel for Mr. Rothenberg (Harris, St. Laurent & Chaudhry LLP), and Mr. Bazzoni by
email delivery the day this Order is entered and by regular mail; and it is further

15.    **ORDERED,** the Liquidator will serve this Order on (i) all known creditors in the
United States (or their United States counsel or registered agent for service of process), (ii) any
party that has filed a notice of appearance in this case, and (iii) the Office of the United States
Trustee within three days after this Order is entered; and it is further

16.    **ORDERED** that such service shall be good and sufficient service and adequate
notice for all purposes.

Dated: New York, New York
         June 21, 2016

                                        /s/ *James L. Garrity, Jr.*
                                        United States Bankruptcy Judge
                                        Southern District of New York