UNITED STATES BANKRUPTCY COURT             NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

In re:                         :
                                :

CINQUE TERRE FINANCIAL GROUP    :   Case No. 16-11086 (JLG)
LIMITED,                      :   Chapter 15
                                :
                     *Debtor.*   :

------------------------------------------------------- x

### MEMORANDUM OF DECISION AND ORDER GRANTING MOTION OF FOREIGN LIQUIDATOR FOR APPROVAL OF SETTLEMENT AGREEMENT

**A P E A R A N C E S:**

SEQUOR LAW, PA
1001 Brickell Bay Drive
9th Floor
Miami, FL 33131
By: Gregory S. Grossman, Esq.

SULLIVAN & WORCESTER LLP
1633 Broadway, 32nd Floor
New York, New York 10019
By: Jeffrey R. Gleit, Esq.

SIMMS SHOWERS LLP
201 International Circle
Baltimore, Maryland 21030
By: J. Stephen Simms, Esq.

BOIES SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
By: Randall W. Jackson, Esq.
    Donald L. Flexner, Esq.
    Byron D.M. Pacheco, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

       Cinque Terre Financial Group Limited (the "**Debtor**") is a company formed under the

laws of the British Virgin Islands (the "**BVI**").  It is the subject of insolvency proceedings in the

BVI and is the debtor in this chapter 15 case.  Stuart MacKellar is the Debtor's BVI court-appointed liquidator (the "**Liquidator**") and is acting as its "foreign representative" herein.  The Debtor's sole shareholder is Alessandro Bazzoni ("**Bazzoni**").  As of the commencement of the BVI Liquidation Proceedings (as defined below), the Debtor's affiliates included a BVI company known as "CT Energia Ltd."  The evidence shows that at some point after the commencement of those proceedings, Bazzoni formed an entity under Malta law that he named "CT Energia Ltd.," but thereafter changed its name to "Elemento Ltd."  [Hereinafter, the BVI and Malta "CT Energia Ltd." entities will be referred to as "**CTEL BVI**" and "**CTEL Malta/Elemento**," respectively.]

The matter before the Court is the Liquidator's motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, for an order approving a settlement agreement (the "**Settlement Agreement**") by and between the Debtor and CTEL Malta/Elemento.[1]  The agreement resolves a dispute arising out of CTEL Malta/Elemento's acknowledged unauthorized use of the Debtor's license agreement (the "**License**") with Petroleos del Peru ("**PetroPeru**") to purchase fuel oil (the "**Naphtha Fuel**") which it thereafter sold, at modest profit, to an entity known as SK Energy Americas ("**SKEA**").  [Hereinafter, the transactions relating to CTEL Malta/Elemento's purchase and sale of the Naphtha Fuel collectively will be referred to as the

---

[1] *See Liquidator's Motion To Approve Compromise*, dated July 20, 2017 [ECF No. 146] (the "**Motion**").  A copy of Settlement Agreement is attached as Ex. B to the Motion.  The Liquidator submitted further documents in support of the Motion, including:  *Liquidator's Reply to the Objection of Centauro Liquid Opportunities Master Fund, L.P. to Motion for Approval of Compromise* [ECF No. 156] (the "**Liquidator Centauro Reply**"); *Liquidator's Reply to the Objection of Chemoil Latin America, Inc. to Motion for Approval of Compromise* [ECF No. 158] (the "**Liquidator Chemoil Reply**"); and *Declaration of Liquidator in Support of Motion to Approve Compromise of Controversy and in Support of Reply to Supplemental Objection* [ECF No. 165] (hereinafter the "**MacKellar Declaration II**").  Moreover, as discussed below, in support of the Motion, the Liquidator also relied on bank statements, corporate filings, and declarations from a non-affiliated, third-party lender and a director of CTEL Malta/Elemento.  All of those documents are attached to the Declaration of Jeffrey R. Gleit in Support of Supplemental Reply by Elemento, Ltd. to the Supplemental Objection of Centauro Liquid Opportunities Master Fund, L.P. to the Liquidator's Motion for Approval of Compromise [ECF No. 167] (the "**Gleit Declaration**").

"**Naphtha Transaction**"].  That dispute was crystalized in motions that the Liquidator filed in this Court against CTEL Malta/Elemento and others (defined below as the "**Bankruptcy Motions**"), and in a maritime attachment and garnishment action (defined below as the "**Maritime Action**") commenced by Chemoil Latin America ("**Chemoil**"), one of the Debtor's creditors, in the United States District Court for the Southern District of Texas (the "**Texas Court**").  CTEL Malta/Elemento has not received the proceeds generated from the Naptha Transaction because by order of the Texas Court, SKEA deposited those funds into the court's registry (the "**Registry Funds**"), pending resolution of the Maritime Action.

In the Maritime Action and the Bankruptcy Motions, the Liquidator contends that the Registry Funds should be paid to the Debtor, not CTEL Malta/Elemento.  His theory is that CTEL Malta/Elemento is an *alter ego* of the Debtor and, in any event, that it used the Debtor's funds to acquire the Naphtha Fuel from PetroPeru, without the Debtor's knowledge or consent. Since the commencement of that litigation, the Liquidator has conducted informal discovery of CTEL Malta/Elemento.  In response to the Liquidator's requests, CTEL Malta/Elemento has produced records from the bank account that is the source of the funds that it used to pay for the Naphtha Fuel (the "**Fuel Acquisition Funds**") and corporate records evidencing the ownership of CTEL Malta/Elemento.  Also, it has provided sworn declarations to the Liquidator from individuals who purport to have knowledge of those matters.  Based upon his review of those documents and the advice of his counsel, the Liquidator has determined that it is in the best interests of the Debtor and its creditors that he resolve the Debtor's claims against CTEL Malta/Elemento relating to the Naphtha Transaction on the terms set forth in the Settlement Agreement.  Among other things, that agreement contemplates that the Registry Funds, which total approximately $12.6 million, will be distributed among the Debtor, Chemoil, and CTEL

2

Malta/Elemento, with the lions-share of those funds being paid to CTEL Malta/Elemento.  It also

calls for the Debtor to give CTEL Malta/Elemento and Richard Rothenberg ("**Rothenberg**")

narrowly tailored releases limited to matters relating to the Naphtha Transaction.  Rothenberg is

an officer and director of CTEL Malta/Elemento who formerly served as the Debtor's chief

financial officer.   The agreement does not expressly address or purport to resolve whether CTEL

Malta/Elemento is an *alter ego* of the Debtor.

   Chemoil initially objected to the Motion.[2]  However, the Liquidator resolved that

objection and Chemoil now supports the Motion.  *See* Liquidator Chemoil Reply at ¶ 2.

Centauro Liquid Opportunities Master Fund L.P. ("**Centauro**") objects to the Motion.  It is not a

party to the Bankruptcy Motions or the Maritime Action, but it is suing the Debtor, CTEL BVI

and others (the "**Centauro Litigation**") in the United States District Court for the Southern

District of New York (the "**District Court**") to recover damages of at least $21 million caused

by the Debtor's and CTEL BVI's alleged default under a promissory note payable by them to

Centauro (the "**Centauro Note**").[3]  That action is stayed as to the Debtor, but not as to CTEL

BVI and the other defendants.  Recently, the District Court authorized Centauro to file and serve

an amended complaint in that action, after having granted, in part, the defendants' motion to

dismiss the initial complaint.  *See Centauro Liquid Opportunities Master Fund, L.P. v.*

*Alessandro Bazzoni, et al*. ("***Centauro I***"), No. 15 CV 9003, 2016 WL 5719793 (S.D.N.Y. Sept.

30, 2016) (memorandum decision and order granting, in part, motion to dismiss complaint);

*Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni* ("***Centaruo II***"), No. 15 CV 9003,

---

[2]  *See Objection of Creditor Chemoil Latin America to Liquidator's Motion for Approval of Compromise* [ECF No. 152] (the "**Chemoil Objection**").

[3]  Although Centauro claims to be among the Debtor's largest creditors, the Liquidator notes that Centauro has not filed or presented a proof of claim to the Liquidator in the BVI Liquidation Proceedings.  *See* Liquidator Centauro Reply at ¶ 2 n.1.

2017 WL 3726754 at *5 (S.D.N.Y. Aug. 28, 2017) (memorandum decision and order granting, in part, Centauro leave to file amended complaint). Among other things, Centauro's amended complaint names CTEL Malta/Elemento as a defendant, and alleges that it is an *alter ego* of CTEL BVI, and is thereby liable to Centauro for all amounts due and owing under the Centauro Note.

Centauro objects to the Settlement Agreement[4] on the grounds that it is not "fair and equitable," since if approved, the agreement may adversely impact the resolution of its claims against CTEL Malta/Elemento in the Centauro Litigation. Centauro Obj. at 6. The Court held hearings (each a "Hearing," and collectively, the "**Hearings**") on the Motion on August 3, 2017, August 24, 2017, and September 21, 2017. For the reasons stated below, Centauro's objections are OVERRULED, and the Motion is GRANTED.

## Jurisdiction

This Court has jurisdiction to finally adjudicate the Motion pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(P). This memorandum of decision and order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable here pursuant to Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure.

---

[4] *See Centauro's Objections To The Liquidator's Motion For Approval Of Compromise* (the "**Centauro Objection**") and the *Declaration of Randall W. Jackson in Support of Centauro's Objections to the Liquidator's Motion for Approval of Compromise* (the "**Jackson Declaration**") [ECF Nos. 153 and 154, respectively]; and *Centauro's Supplemental Objections To The Liquidator's Motion For Approval Of Compromise* (the "**Centauro Supplemental Objection**") and the *Supplemental Declaration of Randall W. Jackson in Support of Centauro's Objections to the Liquidator's Motion for Approval of Compromise* (the "**Jackson Supplemental Declaration**") [ECF Nos. 163 and 164, respectively].

## Facts[5]

**Appointment of the Liquidator and
Commencement of the Chapter 15 Case**

The Debtor was placed in liquidation in the BVI (the "**BVI Liquidation Proceedings**"),
as of April 11, 2016, by the Eastern Caribbean Supreme Court, High Court of Justice, Virgin
Islands, Commercial Division, in the BVI (the "**BVI Court**").  *See Declaration of Stuart
MacKellar in Support of Chapter 15 Petition of Cinque Terre Financial Group Limited for
Recognition of Foreign Insolvency Proceeding* at ¶¶ 1, 8 [ECF No. 3] (the "**MacKellar
Declaration**").  That day, the BVI Court appointed Stuart MacKellar as Liquidator.  *Id.* at ¶ 8.
On April 27, 2016, he petitioned this Court on behalf of the Debtor for recognition of the BVI
Liquidation Proceedings as "foreign proceedings" under chapter 15 of the Bankruptcy Code.  *See
Chapter 15 Petition for Recognition of Foreign Proceedings* [ECF No. 1]; *Verified Petition For
Recognition of Foreign Insolvency Proceedings and Application For Relief Pursuant to Sections
1504, 1507, 1509, 1515, 1517, 1519 and 1521 of the Bankruptcy Code* [ECF No. 2] (the
"**Verified Petition**").  On June 21, 2016, the Court entered an order recognizing the BVI
Liquidation Proceedings as a foreign main proceeding, and the Liquidator as the foreign
representative of the Debtor under sections 1517(b)(1) and 1509 of the Bankruptcy Code,
respectively.  *See Order Granting Recognition and Relief in Aid of Foreign Main Proceeding*
[ECF No. 104].

When he took office, the Liquidator had limited access to the Debtor's books and records,
and little insight into the Debtor's business operations.  Indeed, the Liquidator commenced this
case to obtain this Court's assistance with his investigation of the activities of the Debtor's

---

[5]  Unless otherwise stated, the facts are not in dispute.

former managers and directors in various jurisdictions including, but not limited to, Switzerland,

the United States, and Central America.  *See* Verified Petition at ¶ 3 [ECF No. 2]; MacKellar

Dec. at ¶ 13.  Since his appointment, the Liquidator has determined that Bazzoni was the

Debtor's sole shareholder and Rothenberg served as its chief financial officer.  *See* MacKellar

Dec. at ¶¶ 15-16.  He also maintains that Bazzoni, Rothenberg and Ruben Alejandro Goldstein

("**Goldstein**," and collectively with Bazzoni and Rothenberg, the "**Former Officers**") acted as

the Debtor's management team.  *See* Sanctions Mot. at ¶ 6.[6]

### The Formation of New "Cinque Terre" Entities and Alleged Unauthorized Use of the Debtor's Assets

The Liquidator maintains that after he took office, the Former Officers used the Debtor's

assets and, in effect, continued the Debtor's operations, without the Liquidator's knowledge or

consent, through the following entities that they created under Malta law: CTEL

Malta/Elemento, CT Energia Holding Ltd., and CT Energia Oil and Gas Ltd.  He asserts that the

Former Officers did so in an effort to avoid paying creditors of the Debtor.  *See* Property Mot. at

¶¶ 6, 7.[7]  As relevant to the Naphtha Transaction, the Liquidator asserts that:

- On or about February 10, 2017, CTEL Malta/Elemento exercised, for its benefit, the Debtor's rights under the License and purchased the Naphtha Fuel for the sum of $12,637,896. *Id.* at ¶ 13.

- In its dealings with PetroPeru, CTEL Malta/Elemento, through Goldstein and/or Jesus Pereyra Arizola ("**Arizola**"), the General Manager of Cinque Terre-Peru, misrepresented to PetroPeru that Bazzoni was then the Debtor's Chief Executive Officer, and that he was authorized to negotiate the contract, despite the fact that the Debtor was subject to the BVI Liquidation Proceedings and the Liquidator had not given such authority to anyone. *See* Sanctions Mot. at ¶ 16.

---

[6] "Sanctions Mot." refers to the Liquidator's *Motion for Sanctions Pursuant to 11 U.S.C. § 362(k)(1) and 1520(a)(1)* [ECF No. 133] discussed below.

[7] "Property Mot." refers to the Liquidator's *Motion for Determination of Property of the Debtor* [ECF No. 135] discussed below.

- After CTEL Malta/Elemento won the Naphtha Fuel contract, Goldstein and/or Arizola requested that PetroPeru issue the bill of lading (the "**Naphtha Bill of Lading**") in the Debtor's name, but later asked that it be issued to CTEL Malta/Elemento, in its capacity as the "financial arm" of the Debtor. PetroPeru refused to do so because the sale of the Naphtha Fuel could only be made to the Debtor, as the holder of the License. *Id.* at ¶¶ 17-19.

- Although PetroPeru issued the Naphtha Bill of Lading in the Debtor's name, it was thereafter stamped to reflect that the Debtor had endorsed it over to CTEL Malta/Elemento, even though the Debtor had taken no such action. *Id.* at ¶¶ 19-20.

- After CTEL Malta/Elemento took control of the Naphtha Fuel, it contracted to sell it to SKEA at an expected profit of $47,306.50. *See* Motion, Ex. B (Settlement Agreement) at 1.

To date, CTEL Malta/Elemento has not received the proceeds from the SKEA sale (the "**Naphtha Sale Proceeds**").

### The Maritime Action

Chemoil is a Panama corporation that asserts a $3.9 million claim against the Debtor based upon the Debtor's alleged default under a 2014 contract to purchase fuel oil. It contends that CTEL Malta/Elemento is an *alter ego* of the Debtor and that the Naphtha Sale Proceeds belong to the Debtor, not to CTEL Malta/Elemento. On March 14, 2017, with the Liquidator's consent, Chemoil filed a complaint in the Texas Court, seeking a writ of maritime attachment on the Naphtha Sale Proceeds, in satisfaction of its claim against the Debtor (the "**Maritime Action**"). The complaint named SKEA, as garnishee, and the Debtor, as a defendant. *See* Chemoil Obj. Ex. A – First Amended Verified Complaint at 1; Stay Relief Mot. at ¶¶ 27-28, 30.[8] It also named CTEL Malta/Elemento, Bazzoni, Rothenberg, Goldstein, and Cinque Terre Peru S.A.C. as defendants and alleged them to be *alter-egos* of the Debtor. Chemoil Obj., Ex. A (First Amended Verified Complaint) at ¶¶ 4-5. In substance, as support for its allegation that CTEL

---

[8] "Stay Relief Mot." refers to the Liquidator's *Motion for Stay Relief Pursuant to 11 U.S.C. § 362(d)(1)* [ECF No. 136] discussed below.

Malta/Elemento is an *alter ego* of the Debtor, Chemoil also alleges that Bazzoni formed CTEL

Malta/Elemento in the wake of the BVI Liquidation Proceedings "to avoid paying the [Debtor's]

debt to Chemoil."  Chemoil Obj. Ex. A – First Amended Verified Complaint at ¶ 12.  It further

alleges that CTEL Malta/Elemento used the Debtor's resources in furtherance of the Naphtha

Fuel Transaction.  *Id.* at ¶ 12.

On April 4, 2017, the Texas Court authorized SKEA to deposit the Naphtha Sale

Proceeds into the court's registry (i.e. the Registry Funds) and dismissed SKEA from the action.

*See* Chemoil Obj. at 3; Property Mot., Ex. B (Order granting SKEA's motion to deposit the

Naphtha Sale Proceeds into the Texas Court's Registry).  Chemoil maintains that the Registry

Funds should be turned over to the Liquidator and thereafter paid to the Debtor's creditors, less

an amount equal to Chemoil's costs and reasonable attorneys' fees expended in litigating the

Maritime Action.  Chemoil Obj. at ¶ 7.

CTEL Malta/Elemento opposes the relief Chemoil seeks in the Maritime Action on

grounds, among other, that it is not subject to the personal jurisdiction of that court and, in any

event, that the Texas Court lacks subject matter jurisdiction to adjudicate the action.   *See*

Property Mot. at ¶ 26.  The proceedings in the Maritime Action have been adjourned pending the

resolution of the Motion.

### The Bankruptcy Motions

On April 7, 2017, the Liquidator filed a motion in this Court seeking a determination that

the Registry Funds are property of the Debtor, and a direction that those funds be deposited in

this Court, in the event the Texas Court determines that it lacks subject matter jurisdiction over

the Maritime Action.  *See* Property Mot. at 8.[9]  The Liquidator contends that he is entitled to

such relief because:

- CTEL Malta/Elemento is the *alter-ego* of the Debtor;

- CTEL Malta/Elemento is the successor of the Debtor;

- The Debtor transferred its rights under the License to CTEL Malta/Elemento without consideration and/or reasonably equivalent value, which allowed CTEL Malta/Elemento to purchase the Naphtha Fuel, and/or;

- The Debtor purchased the Naphtha Fuel using the License and then transferred it to CTEL Malta/Elemento by virtue of the fraudulent endorsement of the Naphtha Bill of Lading without consideration and/or reasonably equivalent value.

Property Mot. at ¶ 29.  Specifically, and in part, in the Property Motion, the Liquidator argues

that after commencement of the BVI Liquidation Proceedings, the Former Officers continued to

operate the Debtor, "using resources of Debtor through other foreign corporate entities which

they controlled . . . . to avoid paying creditors of Debtor," including the use of the License and

the Debtor's funds to purchase the Naphtha Fuel for the benefit of CTEL Malta/Elemento, whom

as a result, the Liquidator argues "is the alter-ego of Debtor."  Property Mot. at ¶¶ 6-7, 29.

That same day, the Liquidator filed a motion pursuant to sections 362(k)(1) and

1520(a)(1) of the Bankruptcy Code to sanction CTEL Malta/Elemento and the Former Officers

(collectively, the "**CTEL Malta/Elemento Parties**")[10] for violating the automatic stay.  *See*

*Motion for Sanctions Pursuant to 11 U.S.C. §362(k)(1) and 1520(a)(1)* [ECF No. 133] (the

---

[9]  Specifically, the Liquidator requests "that this Court, with due regard for the upcoming decision of the [Texas] Court, enter an order as to the continued holding of the [Registry Funds] pending determination by the Texas Court for determination if the funds are property of the Debtor or in the event the District Court rules that it lacks subject matter jurisdiction then to direct that the funds currently held by the Texas Court be placed under this Court's jurisdiction for such determination."  Property Mot. at ¶ 27.

[10]  By order entered June 8, 2017, the Court granted the Liquidator's unopposed motion to drop Goldstein from the Sanctions Motion and the Property Motion. *See Order on Unopposed Motion to Drop Party from Contested Matters* [ECF No. 144].

"**Sanctions Motion**").  The Liquidator contends that at all relevant times, each of the CTEL Malta/Elemento Parties was aware of the BVI Liquidation Proceedings and this chapter 15 case, and that the License is the Debtor's property.  *See id.* at ¶¶ 32, 38.  He also contends that each of the CTEL Malta/Elemento Parties intentionally and knowingly violated the automatic stay by using the License to obtain contracts to sell petroleum products, including the Naphtha Fuel.  *Id.* at ¶ 32.  Alternatively, he asserts that in violation of the stay, the CTEL Malta/Elemento Parties caused the Debtor to obtain the Naphtha Fuel, and then, endorsing the Naphtha Bill of Lading to CTEL Malta/Elemento, caused the Debtor to transfer it (for no consideration) to CTEL Malta/Elemento.  *Id.*  Finally, the Liquidator contends that with knowledge of his support for the relief that Chemoil seeks in the Maritime Action, the CTEL Malta/Elemento Parties actively oppose that relief, and are asserting rights over the Debtor's property in violation of the automatic stay.  *Id.*  The Liquidator is seeking compensatory and punitive damages as sanctions. *Id*. at ¶¶ 39, 43.

On April 7, 2017, the Liquidator also filed the Stay Relief Motion seeking to modify the automatic stay *nunc pro tunc* to March 14, 2017, to permit Chemoil, as a creditor of the Debtor, to prosecute the Maritime Action.  [Hereinafter, the Property Motion, Sanctions Motion and Stay Relief Motion collectively will be referred to as the "**Bankruptcy Motions**."]

The Liquidator has not taken steps to prosecute any of the Bankruptcy Motions.  Rather, as discussed below, after he filed them, he initiated settlement discussions with Chemoil and CTEL Malta/Elemento.  Those discussions yielded the Settlement Agreement.[11]

### The Centauro Litigation

---

[11] The Stay Relief Motion resolves any claim that the Liquidator could assert against Chemoil for taking action against the Debtor or Debtor's property in the Maritime Action without first obtaining relief from the automatic stay. The relief sought in that motion is uncontroversial, and resolution of that motion is not a principal element of the Settlement Agreement.  The Court will not discuss it further.

Centauro is party to a 2009 joint venture agreement with the Debtor and CTEL BVI pursuant to which Centauro raised capital for the Debtor to use in oil transactions. Centauro contends that over the life of that agreement, the Debtor misappropriated more than $21 million of its funds. *See Centauro I*, 2016 WL 5719793, at *2. To resolve that dispute, in May 2015, the Debtor and CTEL BVI executed the Centauro Note that obligates them to make monthly payments of $500,000 to Centauro until the full balance of $21,092,213 (plus interest) is paid. *Id.* Bazzoni signed the Note on behalf of both the Debtor and CTEL BVI, in his capacity as Chief Executive Officer of both companies. *Id.* at *1. The Debtor and CTEL BVI failed to make any payments under the Centauro Note. *Id.* at *2.

On November 17, 2015, Centauro filed a complaint (the "**Complaint**") in the District Court seeking to recover over $21 million it claims it is owed under the Centauro Note. The Complaint named the Debtor and CTEL BVI (the "**Signatory Defendants**"), as well as Bazzoni, CT Energia Holding, Ltd., CT Energy Holding SRL, and CTVEN Investments SRL (collectively, the "**Non-Signatory Defendants**") as defendants. *See Centauro I*, 2016 WL 5719793, at *1. The Complaint alleged six causes of action, including two for breach of the Centauro Note and the balance for common law fraud and fraudulent inducement. *See id.* at *2-3. In its Complaint, Centauro asserted all of the causes of action against the Signatory and Non-Signatory Defendants, contending that the latter were liable as *alter-ego*s of the Signatory Defendants. *Id.* Promptly after Centauro commenced the litigation, it sought and obtained an *ex parte* order of attachment against the Debtor and CTEL BVI, which the District Court later confirmed, with modifications, on March 11, 2016 (the "**Order of Attachment**"). Centauro Obj. at 2.

11

Upon the commencement of the chapter 15 case, the litigation was stayed as against the Debtor, however CTEL BVI and the Non Signatory Defendants moved to dismiss the Complaint. By Memorandum Opinion and Order dated September 30, 2016, the District Court dismissed the Complaint against Bazzoni and the rest of the Non-Signatory Defendants, for lack of personal jurisdiction, without prejudice to Centauro's right to seek leave to amend its complaint. *See Centauro I*, 2016 WL 5719793 at *6. In doing so the District Court held that (i) BVI law governed resolution of whether the Non Signatory Defendants were *alter egos* of CTEL BVI, (ii) in the BVI, the substantive law governing *alter ego* liability is English law; and (iii) that Centauro had not alleged sufficient facts to demonstrate that under applicable English law, the Non Signatory Defendants were CTEL BVI's *alter egos*. *Id*. at *5.[12]

On October 21, 2016, Centauro moved to amend the Complaint. The proposed amended complaint (the "**Amended Complaint**" or "**AC**")[13] did not name CT Energy Holding SRL or CTVEN Investments SRL as defendants, and added CTEL Malta/Elemento and CT Energia Oil and Gas Ltd. d/b/a Elemento Oil and Gas Ltd. ("**CTOG**") as named defendants. Thus in the

---

[12] The District Court held that in as much as there was no dispute that the Signatory Defendants were subject to the Court's personal jurisdiction, to establish personal jurisdiction over the Non-Signatory Defendants, Centauro would have to sufficiently allege that they are *alter egos* of the Signatory Defendants. *Centauro I*, 2016 WL 5719793 at *3. The District Court, exercising its diversity jurisdiction, applied New York's choice-of-law principles and found that BVI law was applicable because "[i]n cases where the court must determine whether a corporate form will be disregarded, the law of the state of incorporation governs." *Id*. (citing *Kalb, Vooris & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 132 (2d Cir. 1993)). The District Court concluded that "the substantive law governing *alter ego* liability in the BVI is English law." *Id*. at *4. The District Court found further that while it is settled under English law that "owners are allowed to create companies with the intent of shielding themselves from liability[,]" English courts "will pierce the corporate veil when the corporate form is used as a way to evade prior existing responsibilities." *Id*. Thus, the Court found that to establish that the Non-Signatory Defendants were *alter egos* of the Signatory Defendants, Centauro must demonstrate that (i) the Signatory Defendants "misused their corporate form to avoid or conceal liability to [Centauro]," and (ii) that they did so "to evade prior, existing responsibilities." *Id*. at *4-5. The District Court held that "[e]ven construing all facts in the light most favorable to [Centauro], the Complaint fails to allege facts sufficient to demonstrate misuse of the corporate form of the Signatory Defendants." *Id*. at * 5. Accordingly, the District Court dismissed the Complaint as against the Non-Signatory Defendants for lack of personal jurisdiction. *Id*.

[13] A copy of the Amended Complaint is annexed as Exhibit 15 to the Jackson Declaration.

Amended Complaint, Centauro names as defendants the Debtor and CTEL BVI (the "**AC Signatory Defendants**") and Bazzoni, CT Energia Holding, CTOG and CTEL Malta/Elemento (the "**AC Non-Signatory Defendants**," together, the "**AC Defendants**").  The Amended Complaint asserts three claims against all AC Defendants: (1) breach of the Centauro Note by failure to pay as required; (2) breach of the Centauro Note by failure to distribute revenue as required; and (3) fraudulent inducement in connection with the negotiation of the Centauro Note. *See* AC at ¶¶ 53-75.  In the Amended Complaint, Centauro alleges, among other things, that the District Court has personal jurisdiction over the AC Non-Signatory Defendants because they are *alter egos* of the AC Signatory Defendants, that consented to the jurisdiction of New York courts in the Centauro Note.  *See* AC at ¶¶ 5-6.

The AC Defendants opposed the motion to amend the Complaint, arguing, among other things, that the Amended Complaint failed to plausibly allege facts sufficient to establish personal jurisdiction over the AC Non-Signatory Defendants on an *alter ego* theory.  The District Court granted Centauro leave to file the Amended Complaint against Bazzoni, CT Energia Ltd. and CTEL Malta/Elemento, but not CTOG or CT Energia Holdings.  *See Centauro II,* 2017 WL 3726754 at *5.[14]  In doing so, the District Court found that Centauro had pled under English law that Bazzoni, CT Energia Ltd. and CTEL Malta/Elemento are *alter egos* of CTEL BVI.  More

---

[14]    The District Court found that the allegations in the Amended Complaint were insufficient to establish Bazzoni's misuse of the corporate form with regard to CT Energia Holding and CTOG, as follows:

> The AC alleges only generally that CT Energia Holding owns CTOG and [CTEL Malta/Elemento], a standard corporate structure, and alleges only in a conclusory fashion that these companies lack a separate and concrete corporate character. The paucity of allegations relating to CT Energia Holding and CTOG is especially striking compared to the detailed allegations of fact relating to [CTEL BVI] and [CTEL Malta/Elemento].  The Court therefore concludes that Centauro has failed to establish that the corporate forms of CT Energia Holding and CTOG may be disregarded.

*Centauro II*, 2017 WL 3726754, at *3.

13

specifically, the District Court found that Centauro had "proffered plausibly that the [AC]

Signatory Defendants misused their corporate form to avoid or conceal liability to [Centauro]."

*Id.* at *3.[15]  It also found that Centauro had alleged facts sufficient to show that the [AC]

Signatory Defendants employed the corporate form "as a way to evade prior, existing

responsibilities."  *Id.*[16]

## The Settlement Process

The record reflects that subsequent to the filing of the Bankruptcy Motions, the

Liquidator engaged in a lengthy and detailed assessment of the merits of the Maritime Action

and each of the Bankruptcy Motions.  In addition, his counsel conducted settlement discussions

with CTEL Malta/Elemento's counsel.  *See generally* MacKellar Dec. II.  Apparently, from the

outset of those discussions, CTEL Malta/Elemento conceded that it used the License to acquire

the Naphtha Fuel without the Debtor's or Liquidator's knowledge or consent.  Nonetheless, it

denied that the Registry Funds belonged to, or should be paid to, the Debtor since (i) the Fuel

Acquisition Funds were not the Debtor's funds, and (ii) it is not an *alter ego* of the Debtor.

Thus, in connection with the settlement discussions, the Liquidator focused his review on those

issues.  *See* MacKellar Dec. II at ¶¶ 5, 7-9.

---

[15]  To that end it held that "Centauro has made a <u>prima facie</u> showing in the AC that Bazzoni, as the controlling person of [CTEL BVI], engaged in a misuse of the corporate form that would have avoided CTEL BVI's liability to Centauro under the Promissory Note."  *Id.*  at 3*.  Specifically, the District Court found that the AC alleged that "Bazzoni has used [CTEL BVI's] funds for his personal expenses, and by alleging that [CTEL BVI's] creation of the identically named [CTEL Malta/Elemento], which shared personnel, operations, and revenue streams with [CTEL BVI], constituted misuse of the corporate form."  *Id.*

[16]  The District Court found that it did so, "by alleging that Bazzoni caused [CTEL BVI] to create [CTEL Malta/Elemento] following the commencement of this litigation, and then shifted [CTEL BVI's] personnel, operations, and revenue streams to [CTEL Malta/Elemento], allegedly as a means to avoid [CTEL BVI's] liability to Centauro in this action."  *Id.*

To that end, the Liquidator requested that CTEL Malta/Elemento provide him with (i)

bank records evidencing the source of the Fuel Acquisition Funds; and (ii) sworn statements

from individuals with knowledge relating to (a) the source of the Fuel Acquisition Funds, and (b)

CTEL Malta/Elemento's relationship with Bazzoni and the Debtor.  *See* MacKellar Dec. II at ¶¶

3-9.  As part of its response, CTEL Malta/Elemento produced bank records showing that in early

2016, an entity identified as Brightpark Investments LLC ("**Brightpark**") (*see* Perlicz Dec. at ¶

4) made two wire transfers aggregating the sum of $30,000,000 to CTOG, and that CTOG, in

turn, made two wire transfers to CTEL Malta/Elemento aggregating the sum of $29,965,000.[17]

CTEL Malta/Elemento's bank records also show that on March 8, 2017, it wired the sum of

$12,637,896 to "PETRUPERU SA."  *See* Gleit Dec., Ex. A, at ECF p. 45.  That amount matches

the amount of PetroPeru's invoice to CTEL Malta/Elemento, dated March 7, 2017, which was

also produced to the Liquidator.  *Id.* at 44.

The Liquidator also received three declarations from Paul Perlicz ("**Perlicz**"), an

individual employed to oversee the finances of Brightpark and its affiliates since March 2007,[18]

and a declaration from Carlos Galindez, a director of CTEL Malta/Elemento, since August 19,

2016 (the "**Galindez Declaration**").[19]  Each declaration was submitted to the Liquidator in

---

[17]  Specifically, the CTEL Malta/Elemento bank records show "Brightpark Investm" made wire transfers to CTOG on January 29, 2016 ($12,000,000) and March 8, 2016 ($18,000,000), and that thereafter, CTOG transferred the sums of $11,965,000 and $18,000,000 to CTEL Malta/Elemento on February 4, 2016, and March 10, 2016, respectively.  *See* Gleit Dec., Ex. A, (Account printout for CTOG dated February 16, 2016 reflecting transfer in from "Brightpark Investm" of $12,000,000 on January 29, 2016) [ECF No. 167-1, p. 22].  The Account Statement for CTOG for the period March 1, 2016 to March 31, 2016 shows a transfer in from "Brightpark Investm" of $18,000,000 on March 8, 2016.  *Id.* at 23.

[18]  Those are: (i) the declaration dated May 16, 2017, from Perlicz, as authorized signor (the "**Initial Perlicz Declaration**"); (ii) a supplemental declaration from Perlicz, dated June 13, 2017; and (iii) a second supplemental declaration, dated July 6, 2017 (the "**Perlicz Second Supplemental Declaration**").  *See* Gleit Dec., Ex. A, at ECF 167-1, pp. 14; 7-8, and 4-5, respectively.

[19]  *See* Gleit Dec., Ex. A, at ECF pp. 53-168.  The Liquidator initially provided copies of CTEL Malta/Elemento's bank statements and the Initial Perlicz Declaration to Chemoil, Centauro and other parties in interest.  As of the August 3, 2017 Hearing, he had not provided copies of the Perlicz Supplemental Declaration, the Second Perlicz

response to the Liquidator's requests for information.  The Galindez Declaration and the Perlicz

Supplemental Declaration confirm what the bank records show: Brightpark was the source of the

funds that CTOG transferred to CTEL Malta/Elemento that became the Fuel Acquisition Funds.

*See* Galindez Dec. at ¶¶ 9-10; Perlicz Supp. Dec. at ¶ 6.  Both Mr. Galindez and Mr. Perlicz put a

finer point on that matter by explaining that Brightpark wired the funds to CTOG on behalf of

Cedaridge Investments, S.A. ("**Cedaridge**").  *See* Galindez Dec. at ¶ 12;  Perlicz Supp. Dec. ¶ 6.

Second, both Mr. Perlicz and Mr. Galindez attest to the fact that as of February 7, 2017, CTEL

Malta/Elemento was owned by CISA Holdings.  *See* Galindez Dec. at ¶ 11; Perlicz Second Supp.

Dec. at ¶ 2.  Like Brightpark and Cedaridge, CISA Holdings is 100% beneficially owned by

Ricardo J. Cisneros ("**Cisneros**").  *See* Galindez Dec. at ¶ 12; Perlicz Supp. Dec. at ¶ 11.  In his

declaration, Mr. Galindez provides a detailed recitation of the transactions that culminated in

CISA Holdings' acquisition of CTEL Malta/Elemento, and supports that discussion by including

copies of the relevant corporate documents.  *See* Galindez Dec. at ¶¶ 3-11, 13.[20]

---

Supplemental Declaration, or the Galindez Declaration to any party in interest.  At that Hearing, the Liquidator
requested the Court review those documents *in camera* because they were subject to a confidentiality agreement.  At
the Hearing on August 24, 2017, the Court inquired of CTEL Malta/Elemento's counsel whether those confidential
declarations could be made public and shared with Centauro and its counsel.  Thereafter, the Liquidator provided
copies of all the declarations to Centauro's counsel.  Centauro included copies of those declarations as part of the
Centauro Supplemental Objection.  *See* Declaration of Randall W. Jackson, Exs. B & C, respectively. [ECF No.
164] (the "**Jackson Supplemental Declaration**").  Exhibit A to the Gleit Declaration contains copies of all of the
documents produced by CTEL Malta/Elemento to the Liquidator that have been submitted to the Court for
consideration.

[20]  In his declaration, Mr. Galindez explains that:

- In late 2015, Bazzoni held a 100% ownership interest in CTOG and CT Energia Holding, Ltd ("**CTEH**"),
  and CTEH held a 100% ownership interest in CTEL Malta/Elemento.  Galindez Dec. at ¶ 3.

- In December 2015, CTOG issued additional shares of its stock to Francisco D'Agostino (**D'Agostino**) and
  as a result, D'Agostino and Bazzoni each held a 50% ownership interest in CTOG. *Id*. at ¶ 4.

- On or about January 13, 2016, CTEH transferred its 100% ownership of CTEL Malta/Elemento to CTOG.
  *Id*. at ¶ 5.

- On or about August 19, 2016, Rothenberg and Galindez replaced Bazzoni and D'Agostino as directors of
  CTOG. *Id*. at ¶ 6.

**The Settlement Agreement**

The Settlement Agreement resolves all of the Debtor's claims against CTEL

Malta/Elemento (and against Rothenberg) relating, in any way, to the Naphtha Transaction,

including their competing claims to the Registry Funds. In doing so, it resolves all the issues

raised among those parties in the Bankruptcy Motions and the Maritime Action. It does not

address any matter relating to the Centauro Litigation. *See generally*, Settlement Agreement.

The principal terms of the settlement, with the method of disbursement modified by the parties,[21]

provide as follows:

- Chemoil, the Liquidator, and CTEL Malta/Elemento will file a joint motion (the "**Joint Motion**") in the Texas Court seeking a disbursement of the Registry Funds as follows: (i) the sum of $377,500 (the "**Settlement Payment**") to the Liquidator for the Debtor's benefit; (ii) the sum of $60,000 to Chemoil for its attorneys' fees and costs incurred in connection with commencing and prosecuting the Maritime Action; (iii) the balance of

- On or about January 29, 2016 and March 8, 2016, Brightpark processed two wire transfers, in the amounts of $12,000,000.00 and $18,000,000.00, respectively, on behalf of Cedaridge, as a working capital unsecured loan to CTOG. *Id*. at ¶ 9.

- On or about February 4, 2016 and March 10, 2016, CTOG made capital contributions to CTEL Malta/Elemento in the amounts of $11,965,000.00 and $18,000,000.00, respectively. *Id*. at ¶ 10.

- On or about February 7, 2017, pursuant to a share purchase and novation agreement, by and between CTOG, Cedaridge and CISA Holdings, CTOG sold, transferred and assigned to CISA Holdings 100% of the issued shares, and all voting rights in CTEL Malta/Elemento. *Id*. at ¶ 11.

- As consideration for such shares, a novation of the $30,000,000.00 debt owed to Cedaridge by CTOG was executed and CISA Holdings assumed all liabilities and obligations related to the debt. *Id*. at ¶ 11.

Mr. Perlicz's declarations also collectively provide substantially the same information as provided in the Galindez Declaration, with additional statements that none of the money CTOG received from Cedarbridge through Brightpark originated from the Debtor or any of its affiliates and insiders, or from Harvest Natural Resources, Inc. ("**Harvest Natural**"). *See* Perlicz Second Supp. Dec. at ¶ 5. He further declares that Cisneros has no ties to Harvest Natural or any knowledge of a transaction between it and one of the Debtor's affiliates, CT Energy Holding SRL. *See* Perlicz Supp. Dec. at ¶¶ 16-17.

[21]  In the "Joint Motion to Release Funds from the Registry of the [Texas] Court and for Dismissal of the Case (After Disbursement) Without Prejudice," attached as Exhibit B to the Liquidator Chemoil Reply, the parties to the Settlement Agreement consensually modify the disbursement of the Registry Funds to pay Chemoil directly from the Texas Court's registry, and not, as provided in the Settlement Agreement, from the amount disbursed to CTEL Malta/Elemento's counsel.

the Registry Funds (in excess of $12.2 million) to CTEL Malta/Elemento. Liquidator
Chemoil Reply, Ex. B.

- Upon filing the Joint Motion, the Liquidator shall request the entry of an order of the
  Texas Court authorizing PetroPeru to release to CTEL Malta/Elemento funds totaling
  $84,765 that PetroPeru had withheld from CTEL Malta/Elemento in accordance with the
  underlying agreement; within three days of the Court entering that order, the Liquidator
  shall email PetroPeru advising that he has no objection to PetroPeru releasing those funds
  to CTEL Malta/Elemento. Settlement Agreement at ¶¶ 3, 6.

- On the release of the Settlement Payment to the Liquidator, he will, bearing his own fees
  and costs in connection with litigation in this Court and the Texas Court, dismiss with
  prejudice, the Bankruptcy Motions, and with the consent of Chemoil, also bearing its own
  fees and costs, seek dismissal of the Maritime Action. *Id.* at ¶ 8.

- The Liquidator will release CTEL Malta/Elemento and Rothenberg from claims related to
  the Naphtha Transaction, the Maritime Action, discovery requests made in this case
  concerning the Naphtha Transaction, and the Bankruptcy Motions, in exchange for CTEL
  Malta/Elemento's commitment not to use the Debtor's assets in any future transaction.
  *Id.* at ¶ 9, 11.

- The Liquidator will contact CTEL Malta/Elemento's counsel and/or Rothenberg in the
  event he receives indicia or information that the Debtor is involved in any transactions
  prior to taking steps to challenge such transaction or institute suit against either CTEL
  Malta/Elemento or Rothenberg on account of such transaction. *Id.* at ¶ 12.

The Liquidator explains that he calculated the Settlement Payment based on the aggregate
of: (i) the fees and costs incurred by the Debtor and Chemoil (as of the settlement date) in
connection with the Bankruptcy Motions and Maritime Action; (ii) the profit realized on the
SKEA Sale (after vetting it with industry participants, including Chemoil, and concluding that it
represents a fair market rate); and (iii) an appropriate amount in addition to those sums as a
sanction for acquiring the Naphtha Fuel, in part by means of the unauthorized use of the
licensure rights. *See* MacKeller Declaration at ¶ 11.

### Discussion

Courts favor bankruptcy settlements, because "they minimize costly litigation and further
parties' interests in expediting the administration of the bankruptcy estate." *Motors Liquidation*

18

*Co.*, 555 B.R. 355, 364-65 (Bankr. S.D.N.Y. 2016) (citing *Myers v. Martin* (*In re Martin*), 91 F.3d

389, 393 (3d Cir. 1996)); s*ee also Police & Fire Retirement System of the City of Detroit v. Ambac

Financial Group, Inc. (In re Ambac Financial Group, Inc.)*, Case No. 11 Civ. 7529, 2011 WL

6844533 at *2 (S.D.N.Y. 2011) ("[s]ettlements help clear a path for the efficient administration of

the bankrupt estate").  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue

any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C.

§105(a).  Bankruptcy Rule 9019(a) vests the court with the authority to "approve a compromise or

settlement."  Fed. R. Bankr. P. 9019(a).  The rule has been applied in chapter 15 cases.  *See, e.g.,

In re Grant Forest Prod. Inc*., Case No. 10–11132, 2012 WL 3017090, at *1 (Bankr. D. Del. Apr.

11, 2012) (approving chapter 15 consent order under Rule 9019); *In re Grand Prix Assocs. Inc.*,

No. 09-16545, 2009 WL 1850966, at *6 (Bankr. D.N.J. June 26, 2009) (applying Rule 9019 in

approving settlement in chapter 15 case).  It empowers bankruptcy courts to approve settlements

if they are "fair and equitable" and in the "best interests of the estate."  *Michael Vaughn, William

Fertig, and Elliot Bossen v. The Drexel Burnham Lambert Group, Inc., and Republic National

Bank of New York (In re Drexel Burnham)*, 134 B.R. at 499, 505 (Bankr. S.D.N.Y. 1991) (citing

*Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

424 (1968)); *see also In re Chemtura Corp.,* 439 B.R. 561-593-94 (Bankr. S.D.N.Y. 2010); *In re

Lehman Bros. Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).  In *Motorola v. Committee of

Unsecured Credito*rs (*In re Iridium Operating LLC*), 478 F.3d 452 (2d Cir. 2007), the Second

Circuit, guided by *TMT Trailer Ferry*, held that the factors to be considered in determining whether

a settlement is fair and equitable are interrelated and require the court to evaluate:

> (1) the balance between the litigation's possibility of success and the settlement's future
> benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense,
> inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the
> paramount interests of the creditors," including each affected class's relative benefits "and

the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Id.* at 462 (internal citations omitted) (the "***Iridium* Factors**").

Centauro's objections to the Settlement Agreement are not predicated on the application of the *Iridium* Factors to the proposed settlement. Rather, Centauro contends that the Motion should be denied because the settlement is not "fair and equitable" based on what it perceives will be prejudice to its claims against CTEL Malta/Elemento in the Centauro Litigation if the Court approves the Settlement Agreement. *See* Centauro Supp. Obj. at 6. Centauro notes that for more than a year it has been asserting in the Centauro Litigation that CTEL Malta/Elemento is the *alter ego* of CTEL BVI in an effort to hold CTEL Malta/Elemento "liable [to it] to the same extent as CTEL [BVI] for [its] breach of contract and fraud." *See* Centauro Obj. at 5. Centauro asserts that since the District Court has determined that it properly stated an *alter ego* claim with respect to the relationship among CTEL BVI, Bazzoni, and CTEL Malta/Elemento, it has a "live controversy" with Bazzoni, and CTEL Malta/Elemento in the District Court that may be impacted by the Settlement Agreement. *See* Centauro Supp. Obj. at 2. Centauro notes that in the Bankruptcy Motions, the Liquidator asserts that CTEL Malta/Elemento is an *alter ego* of the Debtor, not of CTEL BVI. *Id.* It argues that "by approving the [Settlement Agreement] on that basis [i.e. that CTEL Malta/Elemento is an *alter ego* of the Debtor] there is a risk that this Court will issue a decision that is at odds with the District Court, which has been considering the *alter ego* issue far longer – since at least October 21, 2016 when Centauro moved to amend its complaint to name [CTEL Malta/Elemento] as an *alter ego* defendant." *Id.* at 2-3. Centauro asserts that in circumstances like these, "where multiple courts are considering similar issues

20

involving the same or overlapping parties," this Court should defer to the Centauro Litigation, in

accordance with the "first-filed" legal doctrine, "which instructs that 'where there are two [or

more] competing lawsuits, the first suit should have priority,' absent special circumstances." *Id.*

at 3 (quoting *First City Nat. Bank and Trust Co. v Simmons*, 878 F.2d 76, 79 (2d Cir. 1989)

(quotation marks and citations omitted)).  Thus, Centauro argues that "given the overlapping

legal and factual issues, and the fact that the District Court is already considering these issues,

this Court should stay its decision on the [Motion] until the resolution of any proceedings

involving [CTEL Malta/Elemento] in the District Court."  *See* Centauro Supp. Obj at 4.

Centauro asserts that such relief is particularly appropriate given the existing Order of

Attachment in the Centauro Litigation, which it says may apply to CTEL Malta/Elemento's

property as an *alter ego* of CTEL BVI.  *Id.* at 3-4.  Centauro also contends that "[g]iven the

uncertainty about [CTEL Malta/Elemento's] true owners and its relationship to CTEL [BVI]

allowing this [Settlement Agreement] to go forward, and allowing [CTEL Malta/Elemento] to

dispose of that property [i.e. its approximately $12,200,000 share of the Registry Funds], would

likely render any further attachment proceedings in the District Court moot."  *Id.* at 4.

The Court finds no merit to this argument.  There is no dispute that in assessing the

merits of the Motion, the Court must "look to the fairness of the settlement to other persons; i.e.

the parties who did not settle." *In re Nutritional Sourcing Corp.,* 398 B.R. 816, 837 (Bankr. D.

Del. 2008) (internal quotation marks and citation omitted).  Nonetheless, as previously noted, in

reviewing the Motion, the Court's focus is on whether the Settlement Agreement is "fair and

equitable" and in the best interests of the Debtor and its creditors.  Centauro's concerns regarding

the impact that the settlement may have on its claims against CTEL BVI and CTEL

Malta/Elemento in the Centauro Litigation are not relevant to the Court's assessment of the

21

Settlement Agreement.  Moreover, Centauro's assertion that the disbursement of the Registry

Funds to CTEL Malta/Elemento undermines the Order for Attachment rings hollow since

Centauro made no effort in the Texas Court to assert a claim to those funds.  In any event,

Centauro misapprehends the Court's function in resolving the Motion.  On a motion to approve a

settlement under Rule 9019, the Court does not decide underlying questions of law or fact.

*Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.), *cert. denied,* 464 U.S.

822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).  In resolving the Centauro Litigation, it may be

necessary for the District Court to determine whether CTEL Malta/Elemento is the *alter ego* of

CTEL BVI.  In contrast, in resolving the Motion, the Court merely must "canvass the issues and

[determine] whether the settlement falls below the lowest point in the range of reasonableness."

*W.T. Grant Co.,* 699 F.2d at 608 (internal quotation marks and citation omitted).  In doing so, the

Court need not, and will not, rule on whether CTEL Malta/Elemento is an *alter ego* of the

Debtor, CTEL BVI or any other party.  Thus, the issues that this Court must consider in

resolving the Motion do not overlap, at all, with those before the District Court in the Centauro

Litigation.  Accordingly, the "first filed" doctrine is not applicable, and the Court will not stay its

consideration of the Motion.

Centauro also contends that the Court should deny the Motion because the Galindez and

Perlicz Declarations are defective, and as such, the Liquidator misplaces his reliance on them as

support for the Motion.  In particular, Centauro focuses on the portions of the Galindez

Declaration in which Galindez describes actions that Bazzoni took in 2015 and early 2016 –

before Galindez was employed by CTEL Malta/Elemento, and in doing so, suggests Bazzoni's

motive in taking those actions.  *See* Centauro Supp. Obj at 4-5.[22]  Centauro contends that the

---

[22] In particular, Centauro focuses on paragraphs 2 and 6 of the Galindez Declaration.  In paragraph 2, Galindez states
that "[i]n 2015, [Bazzoni] sought to build a new oil and gas business and he was advised by various banks familiar

Galindez Declaration should be disregarded in its entirety because it is self-serving and lacks any basis to authenticate the facts stated therein.  *Id.* at 5.[23]  Centauro also contends that the Court should disregard the Perlicz Declarations because Perlicz is not competent to testify to the matters he is addressing in those declarations.[24]  Moreover, it asserts that in his declarations, Perlicz states that he is offering testimony on behalf of "Cisneros."  *Id.* at 5.  Centaruo contends that since Perlicz offers no reason why Cisneros cannot submit his own declaration, "[i]t makes no sense to approve [the Settlement Agreement] on the basis of second and third hand

---

with the industry that Malta was a better domicile than British Virgin Islands.  This decision was largely motivated by tax implications."   In paragraph 6 he asserts that:

> On or about July 25, 2016, [CTEL Malta/Elemento] changed its name to Elemento.  Because the Debtor was in a liquation proceeding under the insolvency laws of the British Virgin Islands, it was necessary for [CTEL Malta/Elemento] to clarity that it was (and always had been) a separate and distinct entity from [the Debtor].  "Rebranding" as Elemento was an attempt to avoid confusion among prospective counterparties.

Galindez Dec. at ¶ 6.

[23]  As support for that assertion, Centaruo contends, among other things:

> Nowhere does Mr. Galindez explain the basis for his knowledge about events that preceded his tenure [at CTEL Malta/Elemento], nor does he even state his current position, job responsibilities, or any other basis to believe that his account of present or past events is accurate. More importantly, nowhere does Mr. Galindez explain how he can state, under penalty of perjury, the intentions of Alessandro Bazzoni in starting and renaming companies – who himself has refused to answer such questions under oath for supposed fear of self-incrimination.

Centaruo Supp. Obj. at 4-5 (citation omitted).

[24]  Centauro asserts that:

> The Perlicz Declarations similarly lack credibility. In his Supplemental Declaration, Mr. Perlicz purports to explain Elemento's ownership structure, *see* Supp. Perlicz Decl. ¶¶ 2-8, – a company he does not work for. He also goes on to explain Elemento's role (or purported lack thereof) in a transaction involving Harvest Natural Resources, Inc. – a transaction that has been the source of considerable motion practice in the Centauro Litigation, that also involved entities he does not work for, *id.* ¶¶16-18. Mr. Perlicz's Second Supplemental Declaration is equally troubling. There, Mr. Perlicz also purports to provide information about entities he does not work for, own, or otherwise control, *see* Second Supp. Perlicz Decl. ¶¶ 5, 8, and to state the rationale for transactions without providing any basis for his knowledge of the decision maker "Cisneros's" rationale, *id.* ¶ 4.

Centauro Supp. Obj. at 5.

23

information submitted by a random employee who nowhere explains the basis for his knowledge

of supposed facts far beyond his position (whatever it may be)." *See* Centauro Supp. Obj. at 5.

Thus, Centauro argues that the Court should disregard the Galindez and the Perlicz Declarations

in their entirety, since "[r]elying on these deficient, suspicious documents to approve this

[Settlement Agreement] would only enable Bazzoni and his shell companies to rack up more

creditors by finding new victims on whom to perpetrate their fraud." *Id*. at 6.

    Those assertions are not persuasive.  First, Bazzoni is not a party to the Settlement

Agreement and is not covered by the Debtor's narrow release in that agreement.  The proposed

settlement does not enable Bazzoni to take any action, or prejudice the Debtor's, Centauro's or

any other party in interest's rights against Bazzoni.  Moreover, in assessing the merits of the

Settlement Agreement, "[i]t is not necessary for the [C]ourt to conduct a 'mini-trial' of the facts

or the merits underlying [each] dispute." *In re Adelphia Commc'ns Corp*., 368 B.R. 140, 225

(Bankr. S.D.N.Y. 2007).  Instead, the Court is required to be "apprised of those facts that are

necessary to enable it to evaluate the settlement and to make a considered and independent

judgment." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640-41 (Bankr. S.D.N.Y. 2012).

Centauro does not challenge the authenticity of the bank records submitted in support of the

Motion or the corporate documents evidencing the transactions leading up to Cisneros'

acquisition of CTEL Malta/Elemento.  Nor does it deny that, with the appropriate foundation,

those records are admissible in evidence. *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011,

1013 (2d Cir. 1987) ("[t]he principal precondition to admission of documents as business records

pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to

be considered reliable") (citing *United States v. Mendel*, 746 F.2d 155, 166 (2d Cir.1984), *cert.

denied*, 469 U.S. 1213 (1985)).  The Court will consider those records in assessing the merits of

24

the Motion. *Cf. Nuevo Pueblo, LLC v. Napolitano (In re Nuevo Pueblo, LLC)*, 608 Fed. Appx. 40, 42 n. 2 (2d Cir. May 5, 2015) (summary order) (in affirming approval of Rule 9019 motion, the Second Circuit rejected appellant's contention that settling parties' testimony regarding the settlement was hearsay, finding that "[t]he bankruptcy court properly considered the testimony to determine the positions of the Trustees (standing in the shoes of the Debtors) and [the other settling party], and to identify the issues the parties would have litigated.") (citations omitted). Even without the Galindez and Parlicz Declarations, the record is sufficient for the Court to make a "considered and independent judgment" on the merits of the Settlement Agreement. *In re Dewey & LeBoeuf LLP*, 478 B.R. at 641.

The Court now turns its attention to its analysis of the *Iridium* Factors and whether to approve the Motion. *Iridium* Factor No. 4 is not relevant to that assessment since no parties in interest other than the Debtor's creditors have taken a position on the Motion. Application of *Iridium* Factor No. 3 is neutral, if not irrelevant, since there is both support for, and opposition to, the Settlement Agreement. No one questions the competency of the Liquidator's counsel (*Iridium* Factor No. 5) or the nature and scope of the narrowly drawn release in the Settlement Agreement (*Iridium* Factor No. 6). Application of those factors favors approving the settlement. So does application of *Iridium* Factor No. 7, since the evidence described above demonstrates that the Settlement Agreement is the product of an arm's length negotiation by and among the Liquidator, Chemoil, and CTEL Malta/Elemento.

In applying *Iridium* Factors No. 1 and No. 2, the Court must balance the litigation risks, including attendant costs, delays, and collection risks (if the litigation is successful), against the benefits to the parties if the settlement is approved. There is no question that if the Registry Funds remain on deposit with the Texas Court, or are deposited in this Court if the Texas Court

determines that it lacks subject matter jurisdiction over the Maritime Action, there is minimal

"collection risk" to the Liquidator if the Liquidator successfully prosecutes the Property and/or

Sanctions Motions.  However, there certainly appears to be "litigation risk" to the Liquidator if

he is forced to litigate either matter.  The issue that is central to the Property Motion is whether

the Registry Funds are the Debtor's property.  As discussed above, in pursuing that motion, the

Liquidator's theory was that he could establish the Debtor's right to those funds either by

showing that CTEL Malta/Elemento used the Debtor's funds to acquire the Naphtha Fuel, or that

CTEL Malta/Elemento is the Debtor's *alter ego.*  In arguing that the Settlement Agreement is in

the best interests of the Debtor and its creditors, the Liquidator contends that based upon the

documents produced by CTEL Malta/Elemento, it is not likely that he will be able to trace the

Naphtha Acquisition Funds to the Debtor.  Moreover, he maintains that it is not likely that he

will be able to establish that CTEL Malta/Elemento is the Debtor's *alter ego* since the corporate

records show that at all times relevant to the Naphtha Transaction, Cisneros, and not Bazzoni,

controlled CTEL Malta/Elemento.

In evaluating the merits of the Motion, and particularly the application of *Iridium* Factors

Nos.  1 and 2 to the Settlement Agreement, the Court "may rely on the opinions of the Debtor,

the parties to the settlement, and the professionals, in evaluating the necessary facts, and it

should factor in the debtor's exercise of its business judgment in recommending the settlement."

*In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y. 2016) (citations omitted).

Still, the Court recognizes that "[w]hile the [C]ourt may give weight to the [Liquidator's]

opinion that the settlement is fair and equitable . . . it may not simply adopt the [Liquidator's]

position without making its own independent inquiry." *Id.* (citations and internal quotation

marks omitted).  Turning first to the Property Motion, the Court notes that in part, section 1521

of the Bankruptcy Code sets forth the relief that may be granted upon the recognition of a foreign

proceeding, whether main or nonmain, at the request of the foreign representative, "where

necessary to protect the assets of the debtor or the interests of the creditors[.]"  11 U.S.C. §

1521(a).  Section 1521(a)(7) provides that in addition to the relief enumerated in sections

1521(a)(1)—(6) (none of which are relevant to the Property Motion), the Court may "grant[] any

additional relief that may be available to a trustee, except for relief available under sections 522,

544, 545, 547, 548, 550, and 724(a)."  11 U.S.C. § 1521(a)(7).  Courts interpret that provision to

mean that  the Court may "allow a foreign representative to utilize turnover [under section 542 of

the Bankruptcy Code] subject, as § 1521 requires, to sufficient protections under  section 1522."

*In re AJW Offshore, Ltd*., 488 B.R. 551, 558 (Bankr. E.D.N.Y. 2013).  *Accord In re Irish Bank*

*Resolution Corp. Ltd. (in Special Liquidation),* 559 B.R. 627, 644 (Bankr. D. Del. 2016) (noting

that "[b]y referring to § 363, a section which authorizes the trustee to 'use, sell, or lease . . .

property of the estate,' the drafters of § 542(a) made it clear that the turnover obligation applies

to property of the estate [under § 541] (the equivalent term of art used in chapter 15 is property

of the debtor 'within the territorial jurisdiction of the United States')") (quoting (internal

quotation marks omitted).  *See also In re ABC Learning Centers Ltd.*, 445 B.R. 318, 341 (Bankr.

D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) (recognizing foreign main proceeding, and

without further discussion, ordering right to use of sections 542 and 543 turnover provisions).

The Registry Funds are plainly within the territorial jurisdiction of the United States.  To prevail

on the Property Motion, the Liquidator would have to establish that the Registry Funds belong to

the Debtor, not CTEL Malta/Elemento.

The bank records clearly call into question whether the Liquidator can establish that the

Naphtha Acquisition Funds originated with the Debtor.  There is plainly litigation risk associated

27

with that claim.  That is equally the case with regard to the Liquidator's assertion that CTEL

Malta/Elemento is the Debtor's *alter ego*.  The Debtor is incorporated in the BVI.  In analyzing

whether CTEL Malta/Elemento is an *alter ego* of the Debtor, the Court first will be required to

determine which jurisdiction's substantive law governs resolution of that issue.  *See Centauro I*,

2016 WL 5719793 at *3.  Except in circumstances where a "significant federal policy, calling for

the imposition of a federal conflicts rule, exists," bankruptcy courts apply the choice-of-law rules

of the forum state to determine which state's substantive law governs.  *Bianco v. Erkins (In re*

*Gaston & Snow)*, 243 F.3d 599, 607 (2d Cir. 2001).  The dispute between the Debtor and CTEL

Malta/Elemento involves property questions which are resolved through application of local law.

*See, e.g.*, *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et*

*Revision S.A.)*, 961 F.2d 341, 349 (2d Cir. 1992).  Accordingly, no such overriding federal policy

or interest is present here.  New York is the forum state and under its choice-of-law rules, "the

law of the jurisdiction having the greatest interest in the litigation will be applied."  *Kalb, Vooris*

*& Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (quoting *Intercontinental Planning Ltd.*

*v. Daystrom, Inc*., 24 N.Y. 2d 372, 382 (1969)).  "In cases [like this one] where the court must

determine whether a corporate form will be disregarded, the law of the state of incorporation [of

the entity whose form is to be disregarded] governs."  *Centaruo I*, 2016 WL 5719793 at *3

(citing *Kalb, Vooris & Co.*, 8 F.3d at 132).  Here the law of the BVI is relevant because the

Liquidator seeks to disregard the Debtor's corporate form.  In *Centauro I*, the District Court

found that under BVI law, courts will look to the law of England in assessing the viability of an

*alter ego* claim.  The District Court found that English law recognizes "veil piercing," and that

"(1) plaintiffs seeking to pierce the corporate veil under English law must allege and prove that

defendants misused a corporate façade; (2) the misuse must have occurred after the liability arose

('the temporal requirement'); and (3) there is a preference under English law for fraud claims directly against individual defendants." *Centauro I*, 5719793, at *4 (quoting *Tianbo Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 249 (E.D.N.Y. 2014)); *Accord In re Tyson*, 433 B.R. 68 (S.D.N.Y. 2010). In support of the Property Motion, the Liquidator contended that Bazzoni formed CTEL Malta/Elemento to defraud the Debtor's creditors. Specifically, he asserted that Bazzoni used the Debtor's resources, including the Debtor's funds and the License, and orchestrated CTEL Malta/Elemento's acquisition of the Naphtha Fuel, to the detriment of the Debtor's creditors. There is plainly risk associated with the Liquidator's assertion that CTEL Malta/Elemento is an *alter ego* of the Debtor because the corporate records produced on behalf of CTEL Malta/Elemento show that it was controlled by Cisneros, not Bazzoni or any of his confederates, when CTEL Malta/Elemento acquired the Naphtha Fuel.

In support of the Sanctions Motion the Liquidator says that CTEL Malta/Elemento violated the automatic stay by: (i) contesting Chemoil's claim in the Maritime Action that the Registry Funds belong to the Debtor, and (ii) using the License, without the Debtor's or Liquidator's consent or approval, to purchase the Naphtha Fuel from PetroPeru. *See* Sanctions Mot. at 32. The Court is not aware of any legal support for the Liquidator's first contention. However, CTEL Malta/Elemento's unauthorized use of the License arguably violated section 362(a)(3) of the Bankruptcy Code. That section bars "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). *See, e.g*., *Geltzer v. Brizinova (In re Brizinova)*, 554 B.R. 64, 79-83 (Bankr. E.D.N.Y. 2016) (trustee's contention that defendants continued to operate debtor's business post-petition, was sufficient to state a claim that defendants violated the automatic stay by exercising control over property of the debtor's estate post-petition). Assuming, *arguendo*, that CTEL

Malta/Elemento violated the automatic stay by using the License, the Liquidator will nonetheless assume litigation risk if he litigates the Sanctions Motion.  First, the Liquidator misplaces his reliance on § 362(k) of the Bankruptcy Code as the predicate for obtaining an award of sanctions. *See* Sanctions Mot. at ¶ 5.  That section applies only to individual debtors.  *See* 11 U.S.C. § 362(k) ("an individual injured by any willful violation of a stay provided by this section may recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages.").  *See also Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 920 F.2d 183, 186-87 (2d Cir. 1990) ("We now hold that a bankruptcy court may impose sanctions pursuant to § 362(h) [now 362(k)] . . . only for violating a stay as to debtors who are natural persons").  Moreover, even assuming that there are grounds for a corporate debtor to recover sanctions for stay relief violations, *see, e.g.*, *In re: Congregation Birchos Yosef*, 535 B.R. 629, 635, 639 (Bankr. S.D.N.Y. 2015), *appeal dismissed sub nom. Bais Din of Mechon L'Hoyroa v. Congregation Birchos Yosef* (*In re: Congregation Birchos Yosef*), (No. 15-CV-6408, 2016 WL 5394755 (S.D.N.Y. Sept. 27, 2016) (sanctioning an entity in addition to individuals, and noting that "in addition to its power under § 362(k) of the Bankruptcy Code, the Court has general contempt power over violations of the automatic stay . . . as well as power under § 105(a) of the Bankruptcy Code . . . including the power to impose coercive sanctions to prevent such [stay] violations from continuing") (internal citation omitted), the scope of the automatic stay applicable in this chapter 15 case may not be broad enough to capture the alleged stay violation.  Pursuant to section 1520(a)(1) of the Bankruptcy Code, upon recognition of a foreign proceeding, the automatic stay provisions of section 362 "apply to property of the debtor that is within the territorial jurisdiction of the United States."  11 U.S.C. § 1520(a)(1).  *See, e.g., In re JSC BTA Bank*, 434 B.R. 334, 342 (Bankr. S.D.N.Y. 2010) (noting that the scope of the automatic stay in a

30

chapter 15 case is intended to apply "only to property within the United States."); *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 679 (S.D.N.Y. 2011) ("Chapter 15 ancillary cases assert only territorial jurisdiction over a debtor's assets located here.").   When used with reference to intangible property, like the License at issue here, the term "within the territorial jurisdiction of the United States" means "intangible property deemed under applicable nonbankruptcy law to be located within that territory, including any property subject to attachment or garnishment that may properly be seized or garnished by an action in a Federal or State court in the United States."   11 U.S.C.  §1502(8).   There has been no showing that the alleged stay violation by CTEL Malta/Elemento occurred within the territorial jurisdiction of the United States.

Whether to approve the Settlement Agreement lies within the Court's sound discretion. *See In re Purofied Down Prods Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and 'a clear abuse of discretion'") (quoting *Resolution Trust Corp., et al. v. The Official Committee of Unsecured Creditors of Frost Bros., Inc., et al. (In re Frost Bros.), Inc.*, No. 91 CIV. 5244, 1992 WL 373488, at *4 (S.D.N.Y. Dec. 2, 1992)).  *See also In re Delta Airlines*, 374 B.R. 516, 522 (S.D.N.Y. 2007) ("The bankruptcy court will have abused its discretion if 'no reasonable man could agree with the decision' to approve a settlement") (quoting *In re Frost Bros., Inc.*, 1992 WL 373488, at *3).  While the Court "may consider a creditor's objection to the proposed compromise, the objection is not controlling, and will not bar approval when a review of the settlement shows it does not 'fall below the lowest point in the range of reasonableness.'"  *Michael Vaughn, William Fertig, and Elliot Bossen v. The Drexel Burnham Lambert Group, Inc., and Republic National Bank of New York (In re Drexel Burnham)*, 134 B.R. 499, 506 (quoting *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599,

31

608 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)) (further internal

citations omitted).  As set forth above, the Court has considered Centauro's objections to the

Motion and has undertaken an independent assessment of the merits of the Motion.  The Court

finds that the Settlement Agreement properly accounts for the risks to the Liquidator associated

with litigating the Property, Stay Relief, and Sanctions Motions, and that the Settlement

Agreement does not fall below the lowest point in the range of reasonableness.

<u>**Conclusion**</u>

Based upon the foregoing, Centauro's objections are OVERRULED, and the Motion is

GRANTED.

IT IS SO ORDERED.

Dated:  New York, New York
     October 24, 2017

/s/ *James L. Garrity, Jr.*
United States Bankruptcy Judge

32